**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **Carter Page**, an individual; **Global Energy Capital LLC**, a limited liability company; and **Global Natural Gas Ventures LLC**, a limited liability company; <br><br> Plaintiffs, <br><br> v. <br><br> **Democratic National Committee**, an unincorporated association; **DNC Services Corporation**, a District of Columbia non-profit corporation; **Perkins Coie LLP**, a limited liability partnership; **Marc Elias**, an individual; and **Michael Sussman**, an individual; <br><br> Defendants. | Case No. 1:20-cv-00671 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## I.      INTRODUCTION

1.      The Defendants are private actors who used false information, misrepresentations and other misconduct to direct the power of the international intelligence apparatus and the media industry against a private individual, Plaintiff Carter Page, to further their political agenda.

2.      Dr. Page is a patriotic American who has served as an intelligence source for both the Federal Bureau of Investigation and the Central Intelligence Agency. He is a foreign policy scholar and business leader who graduated with distinction from the United States Naval Academy. Dr. Page was also an informal member of a foreign policy advisory committee to then-candidate Donald J. Trump's campaign during the 2016 United States Presidential Election.

3.      In connection with an effort to counter the Trump campaign, Defendants undertook to develop opposition research regarding Trump and his campaign, including persons associated with that campaign.

4. As part of this effort, Defendants developed a dossier replete with falsehoods about numerous individuals associated with the Trump campaign—especially Dr. Page. Defendants then sought to tarnish the Trump campaign and its affiliates (including Dr. Page) by publicizing this false information.

5. Defendants' efforts mobilized the news media against Dr. Page, damaging his reputation, and effectively destroying his once-private life. The Defendants' wrongful actions convinced many Americans that Dr. Page is a traitor to the United States, and as a result he has received—and continues to receive—multiple death threats. Dr. Page's businesses have suffered greatly from the false, malicious information spread by Defendants. In short, Defendants' actions have not only damaged Plaintiffs' reputations and financial prospects, they have even caused Dr. Page to reasonably fear for his safety.

6. Defendants misrepresented Dr. Page's connections to and interactions with certain foreign nationals in order to create the false impression that Dr. Page—who served his country honorably in the United States Navy and in the private sector—was in fact an agent of a foreign power, Russia. Defendants leveraged these fabrications within the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("DOJ"), leading these agencies to present false applications to the Foreign Intelligence Surveillance Court ("FISC"). As a result, Dr. Page was wrongfully and covertly surveilled by the United States government pursuant to Foreign Intelligence Surveillance Act ("FISA") warrants for more than a year, and has seen his reputation ruined and his personal safety threatened.

7. FISA is designed to protect Americans from the dangers of global terrorism and espionage. But in this instance the FISA process was egregiously misused against Dr. Page. Defendants contrived false statements against Dr. Page. Defendants and those who supported them used these falsities to obtain FISA warrants against Dr. Page for their own political purposes.

8. Multiple investigations have made clear that Dr. Page was wrongly accused and was not working for any foreign power. The DOJ Inspector General said as much after an extensive

nineteen-month investigation that culminated in an over 400-page report published on December 9, 2019, addressing FISA abuse at the FBI ("the IG Report").

9. Even the DOJ and the FISC have recognized that the false information spread by Defendants led to invalid FISA warrants against Dr. Page. On January 7, 2020, the DOJ declared invalid at least two of the applications for surveillance warrants against Dr. Page, explaining that those warrants were based on a series of material misstatements and omissions.

10. This Complaint seeks to remedy a particularly harmful subset of the broad-based wrongs against Dr. Carter Page that occurred in the run-up to, and immediate aftermath of, the 2016 U.S. Presidential Election: the defamation and tortious interference instigated by the Democratic National Committee and high-powered lawyers at Perkins Coie LLP.

## II.    PARTIES

11. Plaintiff Dr. Carter Page is a natural person who is a citizen and domiciliary of the State of Oklahoma.

12. Plaintiff Global Energy Capital LLC ("Global Energy") is a New York LLC. Its sole member is now Dr. Page.

13. Plaintiff Global Natural Gas Ventures LLC ("Global Natural Gas") is an Oklahoma LLC. Its sole member is now Dr. Page.

14. Defendant Democratic National Committee is a national committee (as defined by 52 U.S.C. § 30101) with its principal place of business in Washington, D.C. The Democratic National Committee is registered with the FEC as DNC Services Corp./ Dem. Services Corp, and it operates through Defendant DNC Services Corporation. In turn, DNC Services Corporation is a District of Columbia not-for-profit corporation, with its principal place of business in Washington, DC. The Democratic National Committee undertakes most of its business and financial activities through DNC Services Corporation. (The Democratic National Committee and DNC Services Corporation are collectively referred to in this Complaint as the "DNC.").

15.    Defendant Perkins Coie LLP ("Perkins Coie") is an international law firm with over 1,000 lawyers. Perkins Coie has twenty offices worldwide, and its Chicago office has about 144 lawyers and officers. Approximately 67 Perkins Coie partners operate out of the Chicago office.

16.    Defendant Marc Elias is a natural person who is domiciled in Washington, DC. He is a Partner at Perkins Coie. Elias represents the DNC, Democratic Senatorial Campaign Committee, Democratic Congressional Campaign Committee, National Democratic Redistricting Committee, Priorities USA, Senate Majority PAC and House Majority PAC. Elias also represented then-U.S. Senator from Illinois Barack Obama from at least as early as 2006, including throughout the period that Obama served as United States President and titular head of the DNC. Elias has served as chair of Perkins Coie's political law practices since after the start of the Obama Administration in 2009. In 2016, he organized the opposition research which led to the U.S. Government's surveillance abuse against Plaintiff.

17.    Defendant Michael Sussman is a natural person who is domiciled in Washington, DC. He is a Partner at Perkins Coie and has represented the DNC.

## III.    JURISDICTION AND VENUE

### A.    Subject Matter Jurisdiction

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity). There is complete diversity, and the amount in controversy exceeds $75,000, exclusive of costs and interest. Dr. Page is a citizen of Oklahoma. Global Energy and Global Natural Gas are LLCs, with one member each—Dr. Page. As such, their citizenship is the same as his. Elias and Sussman are citizens of Washington, DC. Perkins Coie, as an LLP, is a citizen of every state where one of its partners is domiciled. No Perkins Coie partner is domiciled in Oklahoma. The Democratic National Committee is a national committee with its principal place of business in Washington, DC. The DNC entities have a principal place of business in Washington, D.C.

### B.    Personal Jurisdiction

19.    This Court has specific personal jurisdiction over all Defendants because this case arises out of their contacts with the forum.

20. The DNC, Perkins Coie, and Elias' relationship with Fusion GPS was orchestrated through Perkins Coie's Chicago office. Among other things, in October 2017, the United States House of Representatives subpoenaed Fusion GPS about its role in the reports. Perkins Coie and its client the DNC then faced a choice: whether to assert attorney-client privilege over its relationship with Fusion GPS. Ultimately, they decided to waive privilege.

21. That decision was made out of the Perkins Coie Chicago office. A senior lawyer in Perkins Coie's Chicago office relayed that decision to Fusion GPS's counsel. When relaying it, that senior Chicago lawyer discussed unique specifics of Perkins Coie's relationship with Fusion GPS, the DNC, and the Clinton Campaign—including disclosing that Perkins Coie retained Fusion GPS in April 2016 to perform a variety of research services on behalf of Perkins Coie's clients (the DNC and the Clinton Campaign).

22. Perkins Coie's decision to waive privilege was not a decision that Perkins Coie could ethically make alone. Instead, ethical rules required that Perkins Coie consult its clients— the DNC and the Clinton campaign—and obtain their consent for waiver. Therefore, the DNC and the senior Perkins Coie Chicago lawyer would have consulted on the issue of whether to waive privilege.

23. Additionally, the Perkins Coie political law practice has significant ties to Chicago. As mentioned above, Elias, the head of the firm's political law practice, was the lawyer for Illinois citizen Barack Obama from at least as early as 2006, including while Obama served as the preeminent leader of the DNC.

24. Perkins Coie also owns Perkins Coie LLC, which is an Illinois LLC. The manager of Perkins Coie LLC is John Devaney, the long-term leader and manager of Perkins Coie.

25. On top of all this, the DNC has a historical pattern of making its principal place of business in Chicago. In 2008, then-candidate Obama moved the DNC's main operations to Chicago, Illinois. The DNC has continued to conduct significant operations from its Chicago offices through President Obama's administration and through the 2016 presidential election.

C.      **Venue**

26.      Venue in this District is proper pursuant to 28 U.S.C. § 1392(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1392(b)(3) because Defendants are subject to personal jurisdiction in this district.

## IV.      FACTUAL ALLEGATIONS

A.      **Carter Page**

27.      Dr. Page has led an exemplary life, largely out of the public eye. He was an Eagle Scout, then attended the United States Naval Academy, graduating with distinction in the top five percent of his class. Due to his exceptional achievement, he was chosen for the Academy's distinguished Trident Scholar program.

28.      Dr. Page served in the United States Navy for five years, including an assignment to a peacekeeping mission in Morocco. While serving in the Navy, Dr. Page received an M.A. degree in National Security from Georgetown University.

29.      Following his military service, Dr. Page served as an International Affairs Fellow at the Council on Foreign Relations, where his research focused on energy-related development in the Caspian Sea region. He received an M.B.A. degree from New York University and, in 2000, began work as an investment banker with Merrill Lynch. He rose to become the Chief Operating Officer for Merrill Lynch's energy and power group in New York.

30.      In 2012, Dr. Page received his doctoral degree from SOAS, University of London. He has run an international affairs program at Bard College, and has taught courses on energy and politics at New York University.

31.      During the 2016 Presidential Election, Dr. Page was named as an informal member of the Trump campaign's foreign policy advisory committee. Dr. Page has never met Donald J. Trump.

32.      Dr. Page did not have a Wikipedia entry until September 24, 2016, one day after the publication of defamatory articles stemming from the Defendants' dissemination of false

reports about him. Before Defendants spread their false statements, Dr. Page was not known outside of narrow academic foreign policy and energy finance circles.

**B.    Perkins Coie, Elias, and Sussman are Agents of the DNC**

33.    From early 2016 on, the DNC was focused on supporting Hillary Clinton's presidential campaign.

34.    To ensure that its interests were aligned with the Clinton Campaign, the DNC hired long-time Clinton lawyers Perkins Coie.

35.    Elias and Sussman were two of Perkins Coie's senior partners responsible for representing the DNC. They negotiated the Joint Fund-Raising Agreement between the DNC and the Clinton Campaign. In negotiating that Agreement, Elias acted in at least two capacities: as a Partner of Perkins Coie and as an outside General Counsel of the Clinton Campaign.

36.    Elias and Sussman also acted as lawyers to the DNC during this period. Among other things, Elias represented both the Clinton Campaign and the DNC when the Clinton Campaign's control of the DNC reached the public.

37.    Elias and Sussman, as agents of the DNC and in conjunction with Perkins Coie lawyers in Illinois, were tasked with hiring a company to engage in opposition research on behalf of the DNC, and its preferred presidential candidate, Hillary Clinton.

38.    Perkins Coie's legal bills were paid in large part by the DNC.

**C.    Perkins Coie, the DNC, and Their Associates Retain Fusion GPS and Steele**

39.    In April 2016, as agents of the DNC, Elias, Sussman and Perkins Coie retained Fusion GPS on the DNC's behalf to produce negative information on then-candidate Trump.

40.    Defendants funded Fusion GPS's research. Fusion GPS reported to Elias the information from its research.

41.    Fusion GPS is and was a private investigation firm specializing in politics. It was founded in 2010 by *Wall Street Journal* investigative reporter Glenn Simpson. Simpson had joined the *Wall Street Journal* in 1995. From 1995 to 2001, Simpson lived in Washington, DC. Simpson

left the *Wall Street Journal* in 2009. Simpson is a longtime friend of Michael Isikoff, the Chief Investigative Correspondent at Yahoo News.

42.     Defendants knew that Fusion GPS spread false information about its clients' opponents. In sworn testimony before Congress, multiple individuals have stated that Fusion GPS employs "smear experts" and uses "scorched earth methods" to fulfill their tasks, regardless of the truth. Fusion GPS was effectively a false information mercenary for sale to the highest bidder.

43.     For example, Fusion GPS was hired by a Russian state-owned company, Prevezon Holdings, to gather information for Prevezon to use against its opponents, including Bill Browder, a prominent advocate for the Sergei Magnitsky Rule of Law Accountability Act, passed by the U.S. Congress in 2012. In sworn testimony to Congress, Browder stated that Fusion GPS spread misinformation about him in an effort to stop any investigation into Prevezon's alleged tax fraud.

44.     This work triggered the Permanent Select Committee on Intelligence of the U.S. House of Representatives' investigative interest in identifying other businesses and firms that had hired Fusion GPS to perform Russia-related work. Thus, at the same time that Fusion GPS was spreading misinformation about Dr. Page's supposed connection with Russia, it had been publicly accused of acting as an unregistered agent of the Russian government, in violation of the Foreign Agent Registration Act.

45.     Additionally, Fusion GPS was hired by a company with close ties to the Maduro regime in Venezuela to shut down criticism and investigation into the company. Without any basis or evidence, Fusion GPS spread misinformation about a journalist who had criticized the company, labeling him a pedophile, drug addict, and thief.

46.     Fusion GPS, in turn, brought in Christopher Steele to work with it on this project. Steele knew that his work on this project was being paid for by the DNC and the Clinton Campaign. The DNC and the Clinton campaign paid Perkins Coie $12.6 million for its services. In turn, Perkins Coie paid Fusion GPS $1.02 million, of which Steele received $168,000.

47.     Sworn testimony has established that Steele and Fusion GPS conducted research into Dr. Page, Global Energy, and Global Natural Gas, searching "business registers, legal databases, all kinds of things."

48.     During Steele's engagement in the summer of 2016, he prepared approximately seventeen anti-Trump memoranda known collectively as the "Steele Dossier." Two of the seventeen memoranda contained references to Dr. Page. "Company Intelligence Report 2016/94," dated July 19, 2016, was titled "Russia: Secret Kremlin Meetings Attended by Trump Advisor, Carter Page in Moscow (July 2016)." In pertinent part, the report stated:

> Speaking in July 2016, a Russian source close to Rosneft President, PUTIN close associate and US-sanctioned individual, Igor SECHIN, confided the details of a recent secret meeting between him and visiting Foreign Affairs Advisor to Republican presidential candidate Donald TRUMP, Carter PAGE.

> According to SECHIN's associate, the Rosneft President (CEO) had raised with PAGE the issues of future bilateral energy cooperation and prospects for an associated move to lift Ukraine-related western sanctions against Russia. PAGE had reacted positively to this demarche by SECHIN but had been generally non-committal in response.

> Speaking separately, also in July 2016, an official close to Presidential Administration Head, S. IVANOV, confided in a compatriot that a senior colleague in the Internal Political Department of the PA, DIVYEKIN (nfd) also had met secretly with PAGE on his recent visit. Their agenda had included DIVEYKIN raising a dossier of 'kompromat' the Kremlin possessed on TRUMP's Democratic presidential rival, Hillary CLINTON, and its possible release to the Republican's campaign team.

49.     The DNC, Fusion GPS, and Steele knew that the information in the Steele Dossier related to Dr. Page was false. That information was based entirely on unverified and unverifiable statements from unknown sources. In compiling the Steele Dossier, Steele did not abide by professional standards for establishing the credibility of sources or verifying information. Indeed, Steele has acknowledged that the reports were made up of raw "uncorroborated intelligence" and were not meant to be finished products.

9

50.     The Steele Dossier was not just unverified, but included clear errors. The reports had obvious errors that could have been easily fact-checked as incorrect—had Defendants or their allies had any interest in doing so.

51.     Elias stayed apprised of Steele and Fusion GPS's work. After all, Elias hired Fusion GPS—and as a Partner of Perkins Coie and lawyer for the DNC, it was critical for Elias to monitor and direct their work. Elias would then loop in others on the information learned from Fusion GPS.

**D.     Steele and Fusion GPS go to the Press on Behalf of Defendants**

52.     From at least July 2016 and onward, Fusion GPS shared the false Steele Dossier with the press. Perkins Coie hosted at least one meeting with Fusion GPS and Steele, where they discussed the substance of Steele and Fusion GPS's media outreach.

53.     Despite knowing that the information in the Steele Dossier was uncorroborated, Defendants needed to have the information released before the 2016 Presidential Election in order to further their own political motives. On information and belief, Defendants directed Fusion GPS and Steele to disseminate the false information to the media, and even to the FBI.

54.     Fusion GPS and Steele, as DNC consultants, were eager to comply. Their loyalty was with their clients, and not to discretion—or to the truth. Steele was fired from the FBI in late 2016 in large part because he chose to help Defendants release the Fusion GPS reports to the public and revealed his confidential relationship with the FBI.

55.     In short, Fusion GPS and Steele were not interested in serving the public. Instead they acted as hired guns whose obligations ran to furthering the interests of their clients (here, the DNC, Perkins Coie, and Elias). Indeed, Fusion had been accused of acting as an unregistered agent of the Russian government on behalf of its clients such as Prevezon Holdings, a Russian company.

56.     Fusion GPS and Steele met with Yahoo! News, the *New York Times*, the *New Yorker*, the *Washington Post*, and CNN, among others. Fusion GPS and Steele briefed them on the Steele Dossier and the defamatory information contained within.

57.     Specifically, in September 2016, Steele and Simpson met with Yahoo! News reporter Michael Isikoff. During that meeting Steele provided Isikoff with misinformation from

the Steele Dossier, namely, that Dr. Page had travelled to Russia and met with "close associates of Vladimir Putin," including Igor Sechin and Igor Diveykin, to discuss lifting sanctions against Russia.

58.     Steele's information was false. Dr. Page had not and to this day has not met with either of those individuals.

59.     On information and belief, Steele and Fusion GPS shared these false statements about Dr. Page with Isikoff at the behest and direction of the Defendants.

60.     Shortly thereafter, on September 23, 2016, Isikoff published a Yahoo! News article entitled "U.S. intel officials probe ties between Trump adviser and Kremlin."

61.     Isikoff stated in a February 2, 2018, episode of the Yahoo! News podcast "Skullduggery" that his September 23, 2016 article was based on the information that came from Christopher Steele.

62.     The article contained several defamatory statements. For example, the DNC consultant-sourced Yahoo! News article contained information taken directly from the first three paragraphs of Company Intelligence Report 2016/94 of the Steele Dossier, referenced in Paragraph 49. Mirroring Steele's language in the report, the article stated:

> U.S. Intelligence officials are seeking to determine whether an American businessman identified by Donald Trump as one of his foreign policy advisers has opened up private communications with senior Russian officials—including talks about the possible lifting of economic sanctions if the Republican nominee becomes president, according to multiple sources who have been briefed on the issue.
>
> . . . .
>
> But U.S. officials have since received intelligence reports that during that same three-day trip, *Page met with Igor Sechin, a longtime Putin associate and former Russian deputy prime minister who is now the executive chairman of Rosneft*, Russia's leading oil company, a well-placed Western intelligence source tells Yahoo News. . . . At their alleged meeting, Sechin raised the issue of the lifting of sanctions with Page, the Western intelligence source said.
>
> . . . .

11

> U.S. intelligence agencies have also received reports that ***Page met with another top Putin aide while in Moscow — Igor Diveykin.*** A former Russian security official, Diveykin now serves as deputy chief for internal policy and is believed by U.S. officials to have responsibility for intelligence collected by Russian agencies about the U.S. election, the Western intelligence source said.

(emphasis added).

63.     The only sources for these false statements were Steele and Fusion GPS, and Steele and Fusion GPS made these statements to the Yahoo! News reporter. The Yahoo! News article frequently attributed statements to a "Western intelligence source." That source was Steele and Fusion GPS.

64.     The only reports that any U.S. intelligence agency received claiming that Dr. Page had met with sanctioned Russian officials were the baseless reports paid for by the Defendants.

65.     Steele provided these false reports to the FBI knowing that they contained false statements.

66.     Additionally, Sussman met with then-FBI General Counsel James Baker. Sussman passed along information, which included a thick stack of papers, along with a hard drive, to Baker for the FBI to investigate. The information related to the FBI's Trump-Russia investigation.

67.     The impact of these reports was widespread. Multiple other media outlets began to spread the fake story, relying on the Yahoo! News article.

68.     More importantly, the false statements sourced from the DNC consultants in the Yahoo! News article featured prominently in the false applications for FISA warrants.

**E.      Defendants Defamed Dr. Page**

**1.      Defamatory Statements are False and Defamatory *Per Se***

69.     As relevant here, four categories of defamatory statements were made against Dr. Page: the statements in the reports prepared by Christopher Steele; the statements to journalists; the statements presented to U.S. intelligence officials and federal law enforcement; and the false news reports stemming from those statements (collectively, the "Defamatory Statements").

70.     The Defamatory Statements were and are false and defamatory *per se*. Dr. Page never met with Sechin. He never met with Diveykin. He never "colluded" with the Kremlin.

71.     Defendants made and directed the Defamatory Statements. Perkins Coie and Elias (the DNC's agents) worked closely with Fusion GPS and Steele—subcontractors who tailored and disseminated the Defamatory Statements to the press. Perkins Coie directed Fusion GPS's reporting to the press and intended that the Steele Dossier's false information be reported as it was.

72.     Elias directed Fusion GPS and Steele's creation of the Steele Dossier. Elias directed Fusion GPS and Steele to make the Defamatory Statements to the journalists. And Elias's intent in doing this was to get the Defamatory Statements published.

73.     When Defendants made the Defamatory Statements to various reporters, their intent was to cause—and they strongly believed that they would, in fact, cause—the reporters to publish them.

74.     The average person who read or heard the Defamatory Statements understood them to be statements of fact that Dr. Page met with Sechin, Diveykin, and the Kremlin. These were not opinions. These were statements of fact that could be objectively characterized as true or false. And these statements were objectively false. For instance, the DNC-sourced Fusion GPS Steele Dossier was later published by BuzzFeed News, which stated that "TRUMP advisor Carter PAGE holds secret meetings in Moscow with SECHIN and senior Kremlin Internal Affairs official, DIVYEKIN." But Dr. Page did not and has not met with those individuals.

75.     Dr. Page's life and businesses were devastated by the false accusations that he was secretly meeting with sanctioned Russian officials. If the truth were reported, that devastation would have been avoided.

76.     The average person who read or heard the Defamatory Statements understood them to be serious charges against Dr. Page—that he was conspiring with United States geopolitical rival Russia on matters against United States interests. Indeed, persons who read the statements contacted Dr. Page and cursed at him for "trad[ing] out your fucking country for some fucking

Russian dollars" and for being "in cahoots with fucking Rosneft and every fucking Russian oligarch . . . ."

77.    The Defamatory Statements are materially false because they would have a different effect on the average reader or listener from that which the truth would have produced.

78.    The Defamatory Statements are defamatory because they tend to lead the average person in the community to form an evil or bad opinion of Dr. Page. For example, as a direct result of the Defendants' Defamatory Statements, Dr. Page was publicly accused of being a "Russian agent" and having "secret meetings in Moscow with Rosneft and Kremlin officials." The Defamatory Statements also tend to discredit Dr. Page in the conduct of his profession.

### 2.    Defendants Distributed the Defamatory Statements with Actual Malice

79.    The DNC, Perkins Coie, Elias, and Sussman acted with actual malice in disseminating the Defamatory Statements—Defendants disseminated statements with knowledge that they were false or with reckless disregard of whether they were false or not.

80.    The Steele Dossier was expressly based on unverified—and unverifiable—statements by unknown sources. And it was not just unverified; it included clear errors, such as obvious misspellings. The Steele Dossier also made many factual errors on matters of objective truth that could have been easily fact-checked as incorrect—had Defendants or their agents cared to do so.

81.    Defendants are not laymen. They are elite lawyers and seasoned political operatives. They harbored serious doubts about both the truth of the statements and Fusion GPS's reliability. They knew of Fusion GPS's reputation as a purveyor of misinformation. They likely knew that Fusion GPS had been accused of operating as an unregistered agent of the Russian state.

82.    Anybody with a remote understanding of Sechin would know the difficulty of meeting with Sechin. And even the most minimal investigation—asking Western businesspersons active in Russia, for example—would have shown the article's allegations to be meritless.

83. Defendants also knew they had not seen any evidence supporting the Defamatory Statements and that the Defamatory Statements rested upon uncorroborated information—and often second-hand statements.

84. The Steele Dossier amounted to no more than Internet rumor, and it was regularly dismissed as such by people who read it.

85. Given this, Defendants likely knew the Steele Dossier was shot through with falsities, or at a minimum had serious doubts about its truth. These serious doubts were magnified by the obvious reasons (already explained) to doubt the reports' veracity. At no point did any Defendant undertake the most cursory investigation to check whether the information contained in the Steele Dossier was accurate.

86. Defendants simply did not care that Fusion GPS's reports were comprised of outlandish, unsourced conspiracy theories. The DNC, through Perkins Coie, Elias, and Sussman, hired Fusion GPS not to report the truth, but to create dirt. And they forged ahead with disseminating the defamatory information produced by Fusion GPS to further Defendants' own political ambitions.

87. Defendants have never retracted their statements about Dr. Page, despite wide consensus that Fusion GPS's conclusions were unreliable and often wrong. Even the author of the September 23, 2016 Yahoo! News article has publicly admitted this to a significant extent.

88. As for Fusion GPS, it implicitly admitted as much as well. It is now publicly recognized that Fusion GPS's conduct with respect to Dr. Page was potentially criminal. The United States House of Representatives subpoenaed Simpson to testify on the Steele Dossier and Fusion GPS's information gathering practices. But Simpson refused, invoking his Fifth Amendment right against self-incrimination. If such an invocation was proper, Simpson recognized that his testimony on the very subject matter of this Complaint would implicate him in criminal conduct. Simpson could not otherwise properly invoke the privilege.

89. This is no surprise. Fusion GPS and Steele have publicly admitted that the Steele Dossier was not perfectly factual and was not meant for public consumption.

90.     Further, Dr. Page was completely exonerated by Special Counsel Robert Mueller's report. That investigation "did not establish that [Dr.] Page coordinated with the Russian government in its efforts to interfere with the 2016 presidential election."

91.     And on January 20, 2020, the DOJ admitted that at least two of the FISA warrants against Dr. Page were invalid and were based on "material misstatements and omissions."

92.     Despite all this, Defendants have not retracted their statements.

### 3.     Injury to Plaintiffs' Reputation and Businesses

93.     The Defamatory Statements injured Plaintiffs' reputations.

94.     The Defamatory Statements had a domino effect, with other news outlets reporting Defendants' Defamatory Statements. This amplified the range and harm of the Defamatory Statements.

95.     The Defamatory Statements caused Plaintiffs to lose many business opportunities. For example, before Defendants' Defamatory Statements, Plaintiffs were engaged in advanced negotiations to advise a company in Kazakhstan, Samruk-Kazyna, in its strategic privatization plan. Dr. Page and Global Energy experience with restructuring plans for companies in that region uniquely placed them to guide Samruk-Kazyna's plan to a successful close. The Plaintiffs would have received a fee of at least $100,000 per month, scaled to include additional services, in addition to the intangible benefits that a successful relationship with Samruk-Kazyna would have resulted in.

96.     Additionally, Plaintiffs were well on their way to establishing a global commodity trading company in the Middle East. In furtherance of this opportunity Plaintiffs had developed relationship with the Dubai Mercantile Exchange and other regional trading hubs. Annual revenues for the trading company for 2018 were conservatively projected to be around $12,000,000, and to increase exponentially in future years.

97.     Then Defendants disseminated the Defamatory Statements. They caused them to be published and distributed to U.S. intelligence and federal law enforcement officials.

98.     As a result, Samruk-Kazyna backed out of the deal. Executives from Samruk-Kazyna informed the Plaintiffs that it was backing out because of the news reports concerning his supposed meetings with Sechin and Diveykin. Samruk-Kazyna could not afford to do business with someone who was the subject of such significant negative press.

99.     Dr. Page was also ostracized from associating with the DME and the other regional trading hubs, entities with which a friendly relationship was essential for establishing the trading company. Because of Defendants' Defamatory Statements, Plaintiffs were prevented from successfully building the trading company.

100.     Defendants knew the effect that the Defamatory Statements would have on these and other of Plaintiffs' prospective business opportunities. As part of their "research" into Dr. Page, the DNC-funded consultants, Fusion GPS and Steele, specifically dug into the Plaintiffs' business dealings, highlighting that Global Energy focused in part on international oil and gas deals.

101.     Dr. Page also began receiving countless death threats after Defendants published the Defamatory Statements. For example, this is one threat (among many) that was left on Dr. Page's voicemail:

> Yo, what's up man? Sounds like things are going pretty fucking good for you. Go to trade out your fucking country for some fucking Russian dollars. We know what the fuck you've been doing, you piece of shit mother fucker. You think you're not, you know you're not in fucking ***in cahoots with fucking Rosneft and every fucking Russian oligarch*** over there? You fucking half-wit, fucking piece of shit. You deserve everything you fucking get. Every fucking thing you get. If it was up to me, ***after we fucking tried you for treason, we'd take you out in the street and beat the fucking piss out of you with baseball bats***, you cock sucking mother fucker. Next time you turn your back on your fucking country, you'll fucking regret it.

(emphasis added).

102.     Dr. Page did not receive death threats before the Defamatory Statements were published.

103.    Because of these death threats, Dr. Page could no longer walk public streets without reasonably and legitimately fearing for his safety. Dr. Page thus had to avoid the public and crowds as much as physically possible.

**F.      This Action is Timely**

104.    This action was originally filed in the United States District Court for the Western District of Oklahoma, Case No. 5:18-cv-01019, on October 15, 2018.

105.    On January 31, 2019, the Western District of Oklahoma court dismissed Dr. Page's case for lack of personal jurisdiction.

106.    Because this Western District of Oklahoma action was timely and because this action was brought within one year of the dismissal of that action, this case is timely under 735 ILCS 5/13-217.

**V.      CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**By Dr. Page against all Defendants for Defamation**

107.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

108.    Defendants made the Defamatory Statements.

109.    The Defamatory Statements were defamatory *per se*.

110.    The Defamatory Statements concerned Plaintiffs, as they referenced them by name. The average reader understood the statements to be about Plaintiffs, including Dr. Page.

111.    Defendants published the Defamatory Statements. They communicated the Defamatory Statements to someone other than Dr. Page, and Defendants intended that the Defamatory Statements be distributed widely—both nationally and internationally.

112.    The Defamatory Statements were false, substantially untrue, and materially false.

113.    When Defendants made the Defamatory Statements, they knew that they were false or acted in reckless disregard of the truth or falsity of the statements.

114.     Defendants had no applicable privilege or legal authorization to publish the defamatory statements.

115.     The Defamatory Statements were a substantial factor in causing Dr. Page to suffer economic and non-economic loss, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### By Global Energy against all Defendants for Defamation

116.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

117.     Defendants made the Defamatory Statements.

118.     The Defamatory Statements were defamatory *per se*.

119.     The Defamatory Statements concerned Plaintiffs, as they referenced them by name. The average reader understood the statements to be about Plaintiffs, including Global Energy.

120.     Defendants published the Defamatory Statements. They communicated the Defamatory Statements to someone other than Global Energy, and Defendants intended that the Defamatory Statements be distributed widely—both nationally and internationally.

121.     The Defamatory Statements were false, substantially untrue, and materially false.

122.     When Defendants made the Defamatory Statements, they knew that they were false or acted in reckless disregard of the truth or falsity of the statements.

123.     Defendants had no applicable privilege or legal authorization to publish the defamatory statements.

124.     The Defamatory Statements were a substantial factor in causing Global Energy to suffer economic and non-economic loss, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### By Global Natural Gas against all Defendants for Defamation

125.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

126.     Defendants made the Defamatory Statements.

127.     The Defamatory Statements were defamatory *per se*.

128.     The Defamatory Statements concerned Plaintiffs, as they referenced them by name. The average reader understood the statements to be about Plaintiffs, including Global Natural Gas.

129.     Defendants published the Defamatory Statements. They communicated the Defamatory Statements to someone other than Dr. Page, and Defendants intended that the Defamatory Statements be distributed widely—both nationally and internationally.

130.     The Defamatory Statements were false, substantially untrue, and materially false.

131.     When Defendants made the Defamatory Statements, they knew that they were false or acted in reckless disregard of the truth or falsity of the statements.

132.     Defendants had no applicable privilege or legal authorization to publish the defamatory statements.

133.     The Defamatory Statements were a substantial factor in causing Global Natural Gas to suffer economic and non-economic loss, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**By all Plaintiffs against all Defendants for False Light**

134.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

135.     Defendants, acting with reckless disregard, placed Plaintiffs in a false light. As a direct and proximate result of Defendants' actions, they caused the Defamatory Statements to be placed before the public.

136.     Defendants' placement of Plaintiffs in a false light was highly offensive to a reasonable person. No reasonable person could tolerate being publicly accused of colluding with Russia against the United States' interests.

137.     The Defamatory Statements were a substantial factor in causing Plaintiffs to suffer economic and non-economic loss, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### By all Plaintiffs against all Defendants for
### Tortious Interference with Prospective Economic Advantage

138.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

139.     Plaintiffs were well-established in the energy finance transaction space. Their relationships with energy companies included Chesapeake Energy, KazMunayGas, Tatneft, Gazprom. And their relationships with financial institutions included Samruk-Kazyna, Deutsche Bank, Goldman Sachs, Citi, Mubadala Development Company, China investment Corporation, Canaccord Genuity, HSBC, Piper Jaffray Companies, Ladenburg Thalman, and Morgan Stanley. Plaintiffs had the opportunity to enter into business relationships with all the foregoing companies—and a reasonable expectancy of entering those relationships. These prospective relationships would have involved future energy financing transactions.

140.     Defendants knew of these relationships. As part of the false opposition research into Plaintiffs, DNC-sponsored consultants Fusion GPS searched Plaintiffs business records and other databases and provided information on Plaintiffs' business dealings.

141.     Defendants intentionally interfered with these prospective relationships. By publishing the Defamatory Statements and placing Plaintiffs in a false light, Defendants knew that would interfere with Plaintiffs' business.

142.     Had it not been for Defendants' interference, Plaintiffs would have entered into the prospective business relationships.

143.     Defendants' interference used wrongful means, as they defamed Plaintiffs.

144.     As a direct and proximate result of Defendants' interference, Plaintiffs suffered damages, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### By Plaintiffs against all Defendants for Conspiracy

145.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

146.     There was an agreement amongst Defendants to participate in unlawful acts or in lawful acts in an unlawful manner. Specifically, Defendants agreed to participate in defaming Plaintiffs and agreed to participate in placing Plaintiffs in a false light.

147.     Defendants also knowingly provided false information to law enforcement agencies, through their agents Fusion GPS and Steele.

148.     Plaintiffs were injured. Plaintiffs' business prospects were devastated. Dr. Page's reputation was irreparably ruined, and he received numerous death threats, causing him to reasonably fear for his safety.

149.     Plaintiffs' injuries were caused by an unlawful overt act by one of Defendants.

150.     That unlawful overt acts was done pursuant to and in furtherance of Defendants' common scheme.

151.     As a direct and proximate result of Defendants' actions, Plaintiffs suffered damages, in an amount to be proven at trial.

## VI.     PRAYER FOR RELIEF

152.     Plaintiffs demands judgment against Defendants as follows:

i.       An award of compensatory, special and punitive damages in appropriate amounts to be established at trial;

ii.      Injunctive relief prohibiting the publication or republication of the defamatory statements;

iii.     An award of costs associated with this action; and

iv.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

Date: January 30, 2020                    Respectfully Submitted,


  s/ Charles L. Philbrick_____
Brian J. Murray (IL 6272767)
Charles L. Philbrick (IL 6198405)
**RATHJE WOODWARD LLC**
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
Tel: 630-668-8500
Fax: 630-668-9218
Email: BMurray@rathjewoodward.com
       CPhilbrick@rathjewoodward.com

_____
John M. Pierce* (*pro hac vice* forthcoming)
Thomas D. Warren (*pro hac vice* forthcoming)
Andrew E. Calderón (*pro hac vice* forthcoming)
**PIERCE BAINBRIDGE**
**BECK PRICE & HECHT LLP**
355 S. Grand Ave., 44th Floor
Los Angeles, CA 90071
Tel: (213) 262-9333
Email: jpierce@piercebainbridge.com
      twarren@piercebainbridge.com
      acalderon@piercebainbridge.com


* Lead Counsel

*Counsel for Plaintiffs Carter Page,*
*Global Energy Capital LLC, and*
*Global Natural Gas Ventures LLC*