**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CARTER PAGE, et al.,

        Plaintiffs,

    vs.

DEMOCRATIC NATIONAL COMMITTEE; DNC
SERVICES CORPORATION; PERKINS COIE LLP;
MARC ELIAS; AND MICHAEL SUSSMANN,
        Defendants.

Case No. 1:20-CV-00671

Hon. Harry D. Leinenweber

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS COMPLAINT UNDER RULES 12(b)(2), 12(b)(3), AND 12(b)(6) OR**
**IN THE ALTERNATIVE, MOTION FOR JURISDICTIONAL DISCOVERY**

**RATHJE WOODWARD LLC**
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
Tel: (630) 668-8500
Fax: (630) 668-9218

**PIERCE BAINBRIDGE P.C.**
355 South Grand Avenue, 45th Floor
Los Angeles, CA 90071
(213) 262-9333

*Attorneys for Plaintiff Carter Page*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................ 1

PART ONE: FACTUAL BACKGROUND ............................................................................ 4

    I.      THE PARTIES AND ILLINOIS' SAVINGS STATUTE 735 ILCS 5/13-217 .......... 4

          A.      PARTIES.................................................................................................. 4

          B.      LITIGATION HISTORY AND 735 ILCS 5/13-217 ..................................... 5

    II.     DEFAMATORY STATEMENTS ................................................................. 6

PART TWO: ARGUMENTS AND AUTHORITIES ........................................................ 9

    I.      LEGAL STANDARDS ................................................................................. 9

    II.     THIS COURT HAS GENERAL JURISDICTION OVER PERKINS COIE AND THE DNC – THE "ENTITY DEFENDANTS" ................................................. 10

    III.    PLAINTIFFS' CLAIMS ARE *NOT* BARRED BY STATUTE OF LIMITATIONS ......................................................................................... 12

    IV.    THIS COURT HAS SPECIFIC JURISDICTION OVER ALL DEFENDANTS ........................................................................................ 15

    V.     IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY .................................................................. 18

    VI.    THE VENUE IS PROPER FOR THIS CASE.............................................. 20

    VII.   PLAINTIFFS HAVE MADE PLAUSIBLE AND MERITORIOUS ALLEGATIONS OF THEIR SUBSTANTIVE CLAIMS .......................................... 21

          A.      PLAINTIFFS' DEFAMATION CLAIM IS PLAUSIBLE ............................ 21

                i.      THE STATEMENTS ARE *NOT* "SUBSTANTIALLY TRUE" ................................................................................. 22

                ii.     THE STATEMENTS ARE *NOT* REASONABLY CAPABLE OF INNOCENT CONSTRUCTION .............................. 24

                iii.    DEFENDANTS ACTED WITH ACTUAL MALICE..................... 25

i

B.    PLAINTIFFS' FALSE LIGHT CLAIM IN PLAUSIBLE ............................ 26

C.    PLAINTIFFS' TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIM IS PLAUSIBLE .................................................................................. 27

    i.    VALID BUSINESS EXPECTANCIES EXISTED ........................... 27

    ii.    THE INTERFERENCE WAS INTENTIONAL AND UNJUSTIFIABLE ................................................................ 28

D.    PLAINTIFFS' CONSPIRACY CLAIM IS PLAUSIBLE ............................ 29

CONCLUSION ...................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABN AMRO, Inc. v. Capital Int'l Ltd.*,
  595 F. Supp. 2d 805 (N.D. Ill. 2008) ........................................................................ 15

*Aranda v. Hobart Mfg. Corp.*,
  66 Ill. 2d 616 (1977) ...................................................................................................... 5

*Arena Football League, Inc. v. Roemer*,
  947 F. Supp. 337 (N.D. Ill. 1996) ..................................................................... 10, 11, 17

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
  571 U.S. 49 (2013) ......................................................................................................... 9

*Batson v. Live Nation Entm't, Inc.*,
  746 F.3d 827 (7th Cir. 2014) ......................................................................................... 27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................................... 10

*Bogosian v. Bd. of Educ. of Cmty. Unit Sch. Dist.*
  200, 73 F. Supp. 2d 949 (N.D. Ill 1999) ....................................................................... 27

*Borsellino v. Goldman Sachs Group, Inc.*,
  477 F.3d 502 (7th Cir. 2007) ......................................................................................... 30

*Bryson v. News Am. Publ'ns, Inc.*,
  174 Ill. 2d, 77, 87 (1996) .................................................................................... 21, 22, 24

*Cada v. Baxter Healthcare Corp.*
  920 F.2d 446 (7th Cir. 1990) ......................................................................................... 13

*Calloway v. AT&T Corp.*,
  No. 18-C-06975, 2019 WL 4694724 (N.D Ill. Sept. 26, 2019) ..................................... 19

*Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*,
  440 F.3d 870 (7th Cir. 2006) ......................................................................................... 19

*Chapski v. Copley Press*,
  92 Ill. 2d 344 (1982) ...................................................................................................... 24

*Colson v. Stieg*,
  89 Ill. 2d 205 (1982) ...................................................................................................... 25

*Conner v. Copley Press, Inc.*,
  99 Ill. 2d 382 (1984) ............................................................................................... 5

*Cook v. Winfrey*,
  141 F.3d 322 (7th Cir. 1998) ............................................................................ 27, 28

*Coolidge Reagan Found. v. FEC*,
  No.1:19-cv-01493-ESH, 2019 WL 2219195 (D.D.C. May 22, 2019) ..................... 13

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ............................................................................................. 11

*DeClerck v. Simpson*,
  143 Ill. 2d 489 (1991) ............................................................................................ 5

*Dubinsky v. United Airlines Master Exec. Council*,
  303 Ill. App. 3d 317 (1999) .................................................................................. 27

*Dunlop Tires Ops. S.A. v. Brown*,
  564 U.S. 915 (2011) ............................................................................................. 10

*Edwards v. Safer Found., Inc.*,
  171 Ill. App. 3d 793 (1988) .................................................................................... 5

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ............................................................................................. 25

*Gilman Opco LLC v. Lanman Oil Co.*,
  No. 13-CV-7846, 2014 WL 1284499 (N.D. Ill. Mar. 28, 2014) ............................. 19

*Green v. Rogers*,
  234 Ill. 2d 478 (2009) .......................................................................................... 21

*Hampton v. Democratic Party of Ill.*,
  No. 18 C 2069, 2018 WL 5619421 (N.D. Ill. Oct. 30, 2018) ............................... 12

*Hanson v. Denckla*,
  357 U.S. 235 (1958) ............................................................................................... 9

*Hutchinson v. Proximire*,
  443 U.S. 111 (1979) ............................................................................................. 25

*Hyatt Int'l Corp. v. Coco*,
  302 F.3d 707 (7th Cir. 2002) .................................................................................. 9

*Indag GmbH & Co. v. IMA S. P.A.*,
  150 F. Supp. 3d 946 (N.D. Ill. 2015) ................................................................... 19

iv

*Int'l Shoe Co. v. Washington,*
  326 U.S. 310 (1945) ............................................................................................................ 9

*Intercon Sol., Inc. v. Basel Action Network,*
  969 F. Supp. 2d 1026 (N.D. Ill. 2013), *aff'd,* 791 F.3d 729 (7th Cir. 2015) .................................. 26

*Keeton v. Hustler Magazine, Inc.,*
  456 U.S. 770 (1984) .......................................................................................................... 15

*King v. State Bd. of Elections,*
  979 F. Supp. 582 (N.D. Ill. 1996), *judgment vacated,* 519 U.S. 978 (1996) ................................. 12

*Kinslow v. Pullara,*
  538 F.3d 687 (7th Cir. 2008) ................................................................................................ 9

*Kolegas v. Heftel Broad. Corp.,*
  154 Ill. 2d 1 (1992) ....................................................................................................... 26, 27

*Krueger v. Lewis,*
  342 Ill. App. 3d 467 (2003) ................................................................................................ 25

*Lavalais v. Vill. of Melrose Park,*
  734 F.3d 629 (7th Cir. 2013) .............................................................................................. 10

*Levin v. Grecian,*
  974 F. Supp. 2d 1114 (N.D. Ill. 2013) .................................................................................. 13

*Linkepic Inc v. Vyasil, LLC,*
  146 F. Supp. 3d 943 (N.D. Ill. 2015) ............................................................................... 17, 18

*Malatesta v. Leichter,*
  186 Ill. App. 3d 602 (1989) ................................................................................................ 29

*Markarian v. Garoogian,*
  767 F. Supp. 173 (N.D. Ill. 1991) ........................................................................................ 16

*Mizrachi v. Ordower,*
  No. 17 C 8036, 2019 WL 918478 (N.D. Ill. Feb. 25, 2019) ......................................................... 11

*Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex,*
  *P.A.,*
  623 F.3d 440 (7th Cir. 2010) .............................................................................................. 15

*Muzikowski v. Paramount Pictures Corp.,*
  322 F.3d 918 (7th Cir. 2003) ........................................................................................... 22, 24

*Pasulka v. Sykes,*
  131 F. Supp. 2d 988 (N.D. Ill. 2001) .................................................................................... 20

*Perkins Coie LLP v. Corporex Capital LLC*,
No. 2015-L-002914, 2015 WL 1523314 (Ill. Cir. Ct., Cook Cnty., Mar. 20, 2015)..................... 12

*Perkins Coie LLP v. THG Rest. Grp. LLC*,
No. 2011-L-012923 (Ill. Cir. Ct., Cook Cnty. filed Dec. 1, 2011) ................................................. 12

*Purdue Res. Found. v. Sanofi-Sythelabo, S.A.*,
338 F.3d 773 (7th Cir. 2003)........................................................................................................... 9

*Quadro Enters., Inc. v. Avery Dennison Corp.*,
No. 97-C-5402, 1999 WL 759488 (N.D. Ill. Sept. 8, 1999) ......................................................... 28

*Rainey v. City of Chi.*,
10 C 07506, 2013 WL 941968 (N.D. Ill. Mar. 11, 2013) ............................................................. 14

*Reuter v. Mastercard Int'l, Inc.*,
397 Ill. App. 3d 915 (2010) .....................................................................................................29, 30

*Rios v. Bayer Corp.*,
Nos. 125020, 12502, 2020 WL 2963318 (Ill. Sup. Ct. June 4, 2020).....................................17, 18

*Rosner v. Field Enter., Inc.*,
205 Ill. App. 3d 769 (1990) ......................................................................................................... 25

*Rueth v. United States Env't Prot. Agency*,
13 F.3d 227 (7th Cir. 1993) ........................................................................................................... 9

*Sachs v. Ohio Nat'l Life Ins. Co.*,
131 F.2d 134 (7th Cir. 1942) ......................................................................................................... 5

*Sanderson v. Spectrum Labs, Inc.*,
248 F.3d 1159 (7th Cir. 2000)....................................................................................................... 18

*Solaia Tech., LLC v. Specialty Publ'g Co.*,
221 Ill. 2d. 558 (2006) ................................................................................................................. 21

*Specht v. Google, Inc.*,
660 F. Supp. 2d 858 (N.D. Ill. 2009) ........................................................................................... 20

*Steigmann v. Democratic Party of Ill.*,
406 F. Supp. 2d 975 (N.D. Ill. 2005) ......................................................................................10, 12

*Swierkiewicz v. Sorema N. A.*,
534 U.S. 506 (2002)....................................................................................................................... 21

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) ....................................................................................................11, 12

*In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*,
    136 F. Supp. 3d 968 (N.D. Ill. 2015) ...............................................................18, 19

*Tom Olesker's Exciting World of Fashion v. Dun & Bradstreet, Inc.*,
    16 Ill. App. 3d 709 (1973), *judgment rev'd in part & aff'd in part*, 61 Ill. 2d 129
    (1975) .................................................................................................................29

*Touhy v. State Bd. of Elections*,
    62 Ill. 2d 303 (1976) ..........................................................................................12

*Tuite v. Corbitt*,
    224 Ill. 2d 490 (2006) ........................................................................................21

*uBID, Inc. v. GoDaddy Grp., Inc.*,
    623 F.3d 421 (7th Cir. 2010) ..............................................................................15

*United Phosphorus, Ltd. v. Angus Chem. Co.*,
    43 F.Supp.2d 906 (N.D. Ill. 1999) ......................................................................16

*Vachet v. Cent. Newspapers, Inc.*,
    816 F.2d 313 (7th Cir. 1987) .........................................................................22, 23

*Walls v. VRE Chi. Eleven, LLC*,
    344 F. Supp. 3d 932 (N.D. Ill. 2018) ....................................................................9

*Wolfson v. S & S Sec.*,
    756 F. Supp. 374 (N.D. Ill. 1991) .........................................................................9

**Statutes**

735 ILCS 5/13-217 ...................................................................................................4, 5, 6

735 ILCS 5/13-275 ..........................................................................................................1

28 U.S.C. § 1391 .............................................................................................................20

Ill. Rev. Stat.1977, ch. 83, ¶ 24a ....................................................................................5

Ill. Stat. ch. 735 § 5/2-209(c) .........................................................................................9

Okla. Stat. tit. §12-95(4) ................................................................................................12

**Federal Rules**

Fed. R. Civ. P. 8 .............................................................................................................28

Fed. R. Civ. R. 12(b) ....................................................................................9, 10, 20, 28

**Other Authorities**

OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF JUSTICE, REVIEW OF FOUR FISA
    APPLICATIONS AND OTHER ASPECTS OF THE FBI'S CROSSFIRE HURRICANE
    INVESTIGATION, (rev. Dec. 20, 2019) .........................................................................*passim*

Restatement (Second) of Torts, § 652E (1977) ..........................................................................27

## PRELIMINARY STATEMENT

In October 2017, Dr. Carter Page, who had been receiving death threats for over a year since first being defamed in September 2016, was shocked to learn, along with millions of other Americans who follow current events, that Defendant Democratic National Committee ("DNC") had used its law firm, Defendant Perkins Coie, L.L.P., to hire a team of internationally renowned storytellers to procure and publish the most malicious lies imaginable about him. Such information had been out of Dr. Page's reach until that moment. Dr. Page then did what anyone who found themselves in his position would do: he filed a defamation lawsuit against the entities and individuals who were now exposed as the cause of his personal and economic devastation. As further discussed in this Opposition to Defendants Motion to Dismiss ("Opposition"), Dr. Page's lawsuit finds its way into this court several years later because of: (i) certain procedural requirements to be surmounted to finally have his day in court against the Defendants, *as well as* (ii) the Defendants' well-planned proficiency for concealing their outrageous conduct targeting Dr. Page. With the procedural prerequisites resolved, Defendants must *now* be held to answer for their reprehensible conduct. Like the false pleadings they helped distribute to the U.S. Foreign Intelligence Surveillance Court, Defendants' hackneyed metaphor alleging prior litigation of these claims is intentionally wrong and misleading. This case is not Dr. Page taking a "third bite at *the apple*." Rather, it is his first opportunity to hold accountable the culprits who planted *the orchard.*

The instant case was filed on January 30, 2020, by Dr. Page, an Oklahoma citizen, against Defendants, none of whom who are Oklahoma citizens or residents. The Complaint relies on Illinois' Savings Statute, 735 ILCS 5/13-275, in connection with allowing the underlying action Dr. Page commenced in Oklahoma on October 15, 2018, to proceed. For the reasons discussed in Part One Section I, subject matter jurisdiction based on diversity of citizenship, coupled with a qualifying procedural decision from the Western District of Oklahoma within one year of Dr. Page filing the

Complaint, are the foundations for his claim being before this Court. These uncontested legal issues may be decided as a matter of law. This is particularly so since *no* Defendant has questioned the diversity of citizenship issue, or that the Illinois statute squarely applies to Dr. Page's timely refiling of underlying Oklahoma federal case dismissed without prejudice so that it could be refiled.

This background raises the next logical legal question: in the time period leading up to the January 30, 2020 filing, are there facts establishing this Court's ability to exercise general jurisdiction over the two entity Defendants, i.e., the DNC and Perkins Coie (alternatively, the "Entity Defendants"). For all of the reasons set out in Part Two Section II, the answer is a resounding "yes" relying on the vast legal precedents supporting the Northern District of Illinois exercising general jurisdiction over the Entity Defendants. Neither Entity Defendant raises any real question to prevent the Court from exercising general jurisdiction over each of them.

The last temporal legal issue to address involves the timeliness of Dr. Page originally filing these claims in the Western District of Oklahoma. As stated above, less than one year after the bombshell revelations of the DNC and its counsel hatching their scheme to create and widely circulate the despicable document defaming Dr. Page —which is now widely and pejoratively known as "the Dirty Dossier," he filed an action in the Western District of Oklahoma (where he has citizenship) suing Defendants for their intentional misconduct targeting him. In Part Two Section III are facts cataloging the Defendants' reprehensible conduct in detail. This discussion serves two legal objectives relevant at this stage of the proceeding.

First, because of Defendants' actions constituting "fraudulent concealment" of their misconduct (as detailed in Part One Section II), the one-year period of limitations to originally bring suit against them in Oklahoma did not run until Dr. Page learned of the Defendants' seminal involvement and scope of misconduct causing him legal injury. Indeed, the facts giving Dr. Page this knowledge were

not exposed to the public until the United States House of Representatives dogged determination to investigate this situation forced Defendant Perkin Coie's General Counsel to admit—*on October 24, 2017*—the firm's role as the conduit funneling over $1.0 million of funds[1] to Fusion GPS. These funds have now been exposed as DNC funneling money through Perkins Coie to fund the compilation of the defamatory materials: from inception to deployment. The DNC budget for the defamatory materials also contemplated paying for their illicit use by partners of Defendant Perkins Coie—i.e., the two individual Defendants herein, with members of the domestic media and federal law enforcement. The second legal purpose served by reciting these facts is to assure the Court the *individual* Defendants are properly subject to jurisdiction over them in the federal district where their law firm and client may be sued over the same events. Establishing jurisdiction over all Defendants in this federal district further demonstrates venue is properly alleged.

Lastly, for the reasons stated in Part Two Section VII, the substantive claims brought by Plaintiffs are not dismissible merely because Defendants allege *at the pleading stage* the Complaint substantively fails to state a claim for relief on the merits. The Office of the Inspector General's report ("OIG Report") not only uncovered and established the falsity of the statements made about Dr. Page, but also the Defendants' misconduct in connection with engineering their creation and publishing them. The Defendants' culpability causing harm to Dr. Page as a private individual and American citizen has been fully exposed and documented on a national basis; consequently, it cannot plausibly be denied. This action is timely brought to fully vindicate the harm to Dr. Page's legal rights by quantifying the damages the Defendants are liable to him.

For the reasons contained in this Opposition, Plaintiffs respectfully request Defendants' Motion

---

[1] Mark Hosenball, *Ex-British Spy Paid $168,000 for Trump Dossier, U.S. Firm Discloses*, REUTERS, (Nov. 1, 2017), https://www.reuters.com/article/us-usa-trump-russia-dossier/ex-british-spy-paid-168000-for-trump-dossier-u-s-firm-discloses-idUSKBN1D15XH

to Dismiss ("Motion") should be denied.

**PART ONE**: FACTUAL BACKGROUND

I.     **THE PARTIES AND ILLINOIS' SAVINGS STATUTE 735 ILCS 5/13-217**

    A.     **PARTIES**

**Plaintiff.** Dr. Page is a natural person, a citizen and domiciliary of the State of Oklahoma, and the sole member of Plaintiff Global Energy Capital LLC ("Global Energy"), a New York LLC, and Plaintiff Global Natural Gas Ventures LLC ("Global Natural Gas"), an Oklahoma LLC. Compl. ¶¶ 11-13. Dr. Page is a foreign policy scholar and was an informal member of a volunteer foreign policy advisory committee to then-candidate Donald Trump's campaign during the 2016 Presidential Election. *Id.* ¶ 2. Prior to the dissemination of the defamatory statements, Dr. Page was not known outside the narrow academic foreign policy and energy finance circles. *Id.* ¶ 32.

**Defendants.** Defendant DNC is a national political committee and has conducted and maintained a significant, central operation in Chicago since 2008. *Id.* ¶ 25. Defendant Perkins Coie LLP ("Perkins Coie") is an international law firm with a Chicago office boasting 144 lawyers and officers operating out of it, including 67 partners. *Id.* ¶ 15.[2] Defendant Mark Elias ("Elias") is a Partner at Perkins Coie and represents the DNC and its associated organizations. *Id.* ¶¶ 14, 15. Elias is domiciled in Washington D.C. and represented then-U.S. Senator from Illinois, Barack Obama, from at least as early as 2006, including the period that Obama served as President of the United States. *Id.* ¶ 16. Defendant Michael Sussman is domiciled in Washington D.C. Sussman is a Partner at Perkins Coie, where he represented the DNC. *Id.* ¶ 17. These facts are wholly uncontested and establish there

---

[2] Perkins Coie's Chicago office is its third largest by headcount. *See Professionals*, PERKINS COIE, https://www.perkinscoie.com/en/professionals/index.html; Perkins Coie's Chicago office "is among Perkins Coie's largest in terms of lawyer headcount," has been operating continuously for nearly 20 years, and is named one of Chicago's "Top Workplaces" by the *Chicago Tribune*. *See Chicago: Overview*, PERKINS COIE, https://www.perkinscoie.com/en/offices/chicago.html.

is complete diversity of citizenship between the Plaintiffs (Oklahoma) and all Defendants (Illinois and/or D.C., but *not* Oklahoma) so as to confer subject matter jurisdiction over this case to the Court.

### B. LITIGATION HISTORY AND 735 ILCS 5/13-217

Plaintiffs filed a *pro se* defamation action in the United States District Court for the Western District of Oklahoma, Case No. 5:18-cv-01019, on October 15, 2018. *Id.* ¶ 104. On January 31, 2019, the same court dismissed Dr. Page's case (the "Oklahoma Dismissal") *without prejudice* to the refiling of it against these Defendants on the basis that the Court lacked personal jurisdiction over Defendants *in Oklahoma. Id.* ¶ 105. Plaintiffs subsequently filed this action, Case No. 1:20-cv-00671, on January 30, 2020, within one year after the Oklahoma Dismissal. Illinois' savings statute expressly allows plaintiffs to commence a new action "within one year" after the original action was "dismissed by a United States District Court for lack of jurisdiction". 735 ILCS 5/13-217 ("Illinois Savings Statute"). Therefore, Plaintiffs' filing in the Northern District of Illinois was also timely.[3]

In case law interpreting section 217's predecessor (Ill. Rev. Stat.1977, ch. 83, ¶ 24a), courts found the legislature intended parties bringing actions in good faith to be protected from a "complete loss of relief on the merits merely because of procedural defect." *Sachs v. Ohio Nat'l Life Ins. Co.*, 131 F.2d 134, 137 (7th Cir. 1942); *Aranda v. Hobart Mfg. Corp.*, 66 Ill. 2d 616, 622 (1977); *See Conner v. Copley Press, Inc.*, 99 Ill. 2d 382, 385-86 (1984) (holding "that section 24 in its present explicit form is applicable to Federal court dismissals for want of jurisdiction is, of course, completely clear."). Similarly, the Oklahoma Dismissal prevented a trial on the merits for procedural reasons. Timely commencement of a new action should therefore not be unduly barred. As referenced above, <u>no</u> Defendant has complained that <u>either</u> the Oklahoma Dismissal is outside the operation of the Illinois

---

[3] Courts liberally construe section 13-217 of the Code of Civil Procedure in order to achieve its remedial purpose "to protect plaintiffs from complete loss of relief on the merits because of some procedural defect unrelated to the merits." *Edwards v. Safer Found., Inc.*, 171 Ill. App. 3d 793, 796 (1988); *See also DeClerck v. Simpson,* 143 Ill. 2d 489, 491-92 (1991).

Saving Statute, or that Dr. Page waited too long to refile his case in this Court.[4] Furthermore, this is a question of law for the Court to decide. It is therefore undisputed that, as a matter of law the Court has subject matter jurisdiction based on the Parties' diversity of citizenship and refiling the subject Complaint after the Oklahoma Dismissal is within the scope of 735 ILCS 5/13-217.

## II.     DEFAMATORY STATEMENTS

Fusion GPS and Christopher Steele prepared the Steele Dossier, stating Dr. Page had secretly met with Russian officials Igor Sechin and Igor Diveykin. *Id.* ¶ 48. The information was false and based on unverified or unverifiable statements from unknown sources. *Id.* ¶ 49. Steele even acknowledged that the uncorroborated reports were not meant to be finished products. *Id.* Despite knowing the information in the Steele Dossier was uncorroborated, Defendants directed Fusion GPS and its associates to disclose this false information to the FBI; Sussman was directly responsible for releasing to the FBI certain documents with unsubstantiated information on Russian interference in the election, hacking, and connections[5]. *Id.* ¶ 53. These misrepresentations formed a central basis for false FISA court pleadings that Dr. Page was an agent of a foreign power in the eyes of the reader and of the U.S. government. *Id.* ¶ 6. Defendants directed actions by Fusion GPS (and its associates) in releasing this information to various news providers. *Id.* ¶¶ 54, 56. Specifically, in September 2016, Steele and Glenn Simpson, founder of Fusion GPS and longtime friend of Michael Isikoff, Chief Investigative Correspondent at Yahoo! News, met with Isikoff to share the false statements. *Id.* ¶¶ 41, 57. This led to Isikoff publishing a Yahoo! News article entitled "U.S. intel official probe ties between

---

[4] The Defendants' Motion makes a passing reference to the Illinois Saving Statute but only in connection with arguing the underlying Oklahoma civil action was not timely. Thus, the Defendants implicitly and necessarily admit the Oklahoma Dismissal qualifies for protection under the Illinois Savings Statute, and that refiling of the instant action was within the one-year period.

[5] John Solomon, *Collusion Bombshell: DNC Lawyers Met with FBI on Russia Allegations Before Surveillance Warrant*, THE HILL (Oct. 3, 2018), https://thehill.com/hilltv/rising/409817-russia-collusion-bombshell-dnc-lawyers-met-with-fbi-on-dossier-before

Trump adviser and Kremlin." *Id.* ¶ 60. The article contained defamatory statements falsely reporting that, "Page met with Igor Sechin, a longtime Putin associate and former Russian deputy prime minister who is now the executive chairmen of Rosneft. . ." and "Page met with another top Putin aide while in Moscow – Igor Diveykin." *Id.* ¶ 62. According to the OIG Report, the FISA applications against Dr. Page relied entirely on the false information that "Page was an intermediary between Russia and the Trump campaign's then manager (Manafort) in a 'well-developed conspiracy' of cooperation . . . ."[6] The FBI also relied on false accusations that Dr. Page participated in "coordination with the Russian government on 2016 U.S. Presidential Election activities . . . ," and that Dr. Page discussed "future cooperation [with Sechin,] and the lifting of Ukraine-related sanctions against Russia." [7] The investigation found that the FBI actions against Dr. Page were largely based on the Dossier which the Defendants wholly caused to be created and published without any information to corroborate the false allegations targeting Dr. Page contained in the Steele's reports.[8]

On February 2, 2018, Isikoff admitted on a Yahoo! News podcast, "Skullduggery," that the article's information came from Steele. *Id.* ¶ 61. The impact of the reports was widespread, with multiple media outlets amplifying the false story, relying on Isikoff's article. *Id.* ¶¶ 67, 74. The defamatory statements in the reports were objectively characterized as statements of fact – that Dr. Page met with Sechin and Diveykin – by outlets such as Buzzfeed News, which published the statement, "Trump advisor Carter Page holds secret meetings in Moscow with Sechin and senior Kremlin Internal Affairs official, Divyekin." *Id.* ¶ 74. The aim of the Defendants' defamatory statements was clearly to persuade the average reader that Dr. Page was conspiring with Russia against

---

[6] *See* OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF JUSTICE, REVIEW OF FOUR FISA APPLICATIONS AND OTHER ASPECTS OF THE FBI'S CROSSFIRE HURRICANE INVESTIGATION, at vii (rev. Dec. 20, 2019) [hereinafter "OIG REPORT"].
[7] *Id.*
[8] *Id.* at xi

United States' interests. The effectiveness of this malicious and unjustified attack on Dr. Page's character is heard in the recording of an average citizen contacting Dr. Page and cursing at him for "trad[ing] out your fucking country for some fucking Russian dollars" and being "in cahoots with fucking Rosneft and every fucking Russian oligarch . . . ." *Id.* ¶ 76.

As a foreseeable consequence, Plaintiffs lost business opportunities, including one deal, already in an advanced stage of negotiations, to advise a company in Kazakhstan, Samruk-Kazyna. *Id.* ¶ 95. Executives from Samruk-Kazyna informed Plaintiffs after backing out of the deal that it was doing so due to the reports concerning Dr. Page's supposed meetings with Sechin and Diveykin and the company's unwillingness to do business with someone subject to such significant negative press. *Id.* ¶ 98. As a result, Plaintiffs lost the opportunity to receive a fee of at least $100,000 per month along with the intangible benefits a successful relationship with Samruk-Kazyna would bring. *Id.* ¶ 95. Plaintiffs were also effectively ostracized from the Dubai Mercantile Exchange ("DME") and other Middle East trading organizations, entities with which a friendly relationship was essential for establishing a trading company in the Middle East – an opportunity Plaintiffs had been actively pursuing, with conservative estimates of said company's revenues being projected at $12,000,000 annually. *Id.* ¶ 99. Even more distressing, following the publication of Defendants' defamatory statements, Dr. Page began receiving numerous death threats. *Id.* ¶ 101. In one such message, the would-be assailant threatened to "take you out in the street and beat the fucking piss out of you with baseball bats . . . ." *Id.* ¶ 101. Prior to the distribution of the defamatory statements, Dr. Page had never received death threats. *Id.* ¶ 102. These threats led Dr. Page to reasonably and legitimately fear for his safety and to avoid public places whenever possible. *Id.* ¶¶ 102, 103.

## PART TWO: ARGUMENTS AND AUTHORITIES

### I.  LEGAL STANDARDS

**Rule 12(b)(2).** To survive Defendants' motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) Plaintiffs "need only [to] make out a *prima facie* case of personal jurisdiction." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). For this motion, "all well-pleaded facts alleged in the complaint and any unrefuted facts . . . are taken as true." *Purdue Res. Found. v. Sanofi-Sythelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). All reasonable inferences are drawn in Plaintiffs' favor and Plaintiffs are "entitled to the resolution in [their] favor of all disputes concerning relevant facts presented in the record." *Rueth v. United States Env't Prot. Agency*, 13 F.3d 227, 228 (7th Cir. 1993). A federal court sitting in diversity may exercise personal jurisdiction as authorized by state law. *Kinslow v. Pullara*, 538 F.3d 687, 690 (7th Cir. 2008).[9] Conduct by an agent acting on behalf of a non-resident defendant can constitute this contact. *Wolfson v. S & S Sec.*, 756 F. Supp. 374, 377-78 (N.D. Ill. 1991). The requirements under Due Process can be met by "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

**Rule 12(b)(3).** A motion under § 1406(a), and Rule 12(b)(3), *may* allow dismissal "only when venue is 'wrong' or 'improper.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). Whether venue is wrong or improper depends "exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Id.*

---

[9] Defendants' have not denied the complete diversity of the Parties. Accordingly, this Court has subject matter jurisdiction over this case. The Illinois long-arm statute authorizes courts to exercise personal jurisdiction on any basis permitted by the Illinois and United States Constitutions. Ill. Stat. ch. 735 § 5/2-209(c). The Illinois long-arm statute mirrors the standard for federal Due Process: that Defendants have sufficient contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walls v. VRE Chi. Eleven, LLC*, 344 F. Supp. 3d 932, 943 (N.D. Ill. 2018) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

**Rule 12(b)(6).** A Rule 12(b)(6) motion merely "tests the sufficiency of [the] complaint" and "is not designed to resolve the case on the merits." *Steigmann v. Democratic Party of Ill.*, 406 F. Supp. 2d 975, 980 (N.D. Ill. 2005). All allegations in the Complaint are accepted as true and viewed in the light most favorable to Plaintiffs. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). Plaintiffs need not "plead particularized facts" as long as the allegations are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

## II. THIS COURT HAS GENERAL JURISDICTION OVER PERKINS COIE AND THE DNC – THE "ENTITY DEFENDANTS"

General jurisdiction arises when Defendants' contacts with a forum state are "so continuous and systematic as to render them essentially at home in the forum state." *Dunlop Tires Ops. S.A. v. Brown*, 564 U.S. 915, 919 (2011). The federal courts of Illinois have consistently recognized appropriate exercise of general jurisdiction over non-resident defendants whose contact through business relationship with the state can be considered "continuous and systematic." *See Arena Football League, Inc. v. Roemer*, 947 F. Supp. 337, 340 (N.D. Ill. 1996) ("It is proper to exercise general jurisdiction over a non-resident defendant that maintained 'continuous and systematic general business contacts' in Illinois.")

Perkins Coie's prominent physical presence in Chicago is sufficient to meet the general jurisdiction standard. Perkins Coie's Chicago office is its third largest by headcount. The Chicago office has over 140 lawyers and officers, and most importantly, approximately 68 Perkins Coie partners are Illinois residents. Perkins Coie boasts that its Chicago office "is among Perkins Coie's largest in terms of lawyer headcount" and "one of the fastest-growing law firms in Chicago." The Chicago office has been operating continuously for nearly 20 years and even prides itself on being named one of Chicago's "Top Workplaces" by the *Chicago Tribune.* It is clear from the firm's own words that Perkins Coie's contact with the state is sufficiently "extensive and pervasive to approximate physical

presence." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). Perkins Coie's substantial presence in Illinois undeniably shows that the exercise of the jurisdiction will be neither burdensome nor unforeseen. *See Arena Football League Inc.,* 947 F. Supp. at 341.

Defendants' reliance on *Daimler AG v. Bauman* is factually misplaced. *Daimler AG v. Bauman*, 571 U.S. 117 (2014). In *Daimler*, the action was brought against a German corporation in response to its subsidiary's conduct in Argentina. *Id.* at 117. The German corporation had another subsidiary in the US, incorporated in Delaware with its principal place of business in New Jersey, which had a small market in California. *Id* at 123-24. The Supreme Court ruled that the German corporation's contact through its subsidiary's sales in California (2.4% of Daimler's worldwide sales) was insufficient for general jurisdiction. *Id.* at 142. This is not the case for Perkins Coie, whose third largest office in the world is located in Chicago and is one of the fastest growing law firm in the city. Furthermore, Perkins Coie's contact is not comparable to sales by a subsidiary; rather Chicago is home to approximately 68 partners (reportedly, 1 out of 8 Perkins Coie partners is based in its Chicago office) in a limited liability partnership. Defendants' reliance on *Mirzarci v. Ordower* is similarly unreasonable. Whereas Illinois is home to 68 Perkins Coie partners in the Chicago office, in contrast, the *Mizrachi* court found it compelling that the defendant law firm had *no* office in Illinois. *Mizrachi v. Ordower*, No. 17 C 8036, 2019 WL 918478, at *1 (N.D. Ill. Feb. 25, 2019). Perkins Coie even owns and manages Perkins Coie LLC, an Illinois Limited Liability Company with a principal office in Chicago. Despite Defendants' unrealistic understatements, the physical presence and contact of Perkins Coie in Chicago is continuous and systematic to say the least.

Similarly, the DNC is under general jurisdiction of this state. The DNC moved the location of its primary operations to Chicago in 2008, reshaping the DNC's once-centralized operation formerly in Washington D.C. Among other major changes, the DNC integrated its political and field organizing

11

operations into the Obama campaign headquarters in Chicago. The DNC even invited its staffers to relocate to Chicago. Establishing its central operation in Chicago fundamentally makes the DNC's operations in Illinois "extensive and pervasive to approximate physical presence." *Tamburo*, 601 F.3d at 701. Defendants deceptively refuse to differentiate the DNC's operations in Illinois from its operations in other states. However, DNC's conduct since 2008 proves otherwise.

For both Entity Defendants, their purposeful availment *of* this state's courts is demonstrated by their previous experiences appearing *in* the courts of Illinois. Perkins Coie has participated in multiple litigations in the state on its own behalf, even as plaintiffs.[10] DNC has also relied on its Illinois affiliation, Democratic Party of Illinois in dealing with litigation in Illinois.[11] Furthermore, the DNC has on multiple accounts participated in Illinois litigations via *amicus curiae*.[12] The Entity Defendants clearly availed themselves of the Illinois courts. Since the Entity Defendants feel sufficiently "at home" to appear and sue (or otherwise litigate and be heard) in this state, then appearing on the other side of the bar, but at the adjacent table as a Defendant, is only fair.

## III.    PLAINTIFFS' CLAIMS ARE *NOT* BARRED BY STATUTE OF LIMITATIONS

This action is timely filed under all relevant state and federal statutes. Plaintiffs' Oklahoma action was filed in the United States District Court for the Western District of Oklahoma on October 15, 2018. It was filed prior to the state's one-year statute of limitations upon discovering that Plaintiffs have been injured. Okla. Stat. tit. §12-95(4). Here, Defendants' deliberately hidden involvement in the false reports was learned by Plaintiffs from reading the letter released on October 24, 2017. Compl. ¶

---

[10] *See Perkins Coie LLP v. Corporex Capital LLC*, No. 2015-L-002914, 2015 WL 1523314 (Ill. Cir. Ct., Cook Cnty., Mar. 20, 2015); *Perkins Coie LLP v. THG Rest. Grp. LLC*, No. 2011-L-012923 (Ill. Cir. Ct., Cook Cnty. filed Dec. 1, 2011)

[11] *Hampton v. Democratic Party of Ill.*, No. 18 C 2069, 2018 WL 5619421 (N.D. Ill. Oct. 30, 2018); *Steigmann v. Democratic Party of Ill.*, 406 F. Supp. 2d 975 (N.D. Ill. 2005)

[12] *King v. State Bd. of Elections*, 979 F. Supp. 582 (N.D. Ill. 1996), *judgment vacated*, 519 U.S. 978 (1996); *Touhy v. State Bd. of Elections*, 62 Ill. 2d 303 (1976).

21; *see Cada v. Baxter Healthcare Corp.* 920 F.2d 446, 451 (7th Cir. 1990) (stating that a plaintiff can avoid the bar of statute of limitation "if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim"). Prior to this information's release, Plaintiffs had no way to know of Defendants' hand in their injury, despite the exercise of due diligence. This must toll the statute of limitations until, at least, October 24, 2017, when the cause of Plaintiffs' injury became known and the defamation claim first became actionable against *these* Defendants.

Additionally, the statute of limitations for Plaintiffs claims is not barred under the doctrine of equitable estoppel. *Id.* at 450-51.To assert estoppel, Plaintiffs show: "(1) voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2) actual or implied knowledge of the estopped party that the representations were not true; (3) lack of knowledge of the true facts by the innocent party both at time made or at time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the misrepresentations; (5) a reasonable, good-faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party." *Levin v. Grecian*, 974 F. Supp. 2d 1114, 1133 (N.D. Ill. 2013). Under Illinois law, "the test used to evaluate an estoppel claim is whether, considering all the circumstances of the specific case, conscience and honest dealing require that a party be estopped." *Id.*

First, the Entity Defendants hid the misinformation source of the Dossier by inaccurately labeling the DNC's payments to Perkins Coie as "LEGAL SERVICES."[13]  The true purpose was to retain Fusion GPS who then compiled and disseminated the malicious lies.[14] The fact that Perkins Coie was working with DNC and Fusion GPS was concealed, denying Plaintiffs the ability to identify source of

---

[13] Compl. ¶ 21, *Coolidge Reagan Found. v. FEC*, No.1:19-cv-01493-ESH, 2019 WL 2219195 (D.D.C. May 22, 2019)
[14] *See* OIG REPORT, *supra* note 6, at 93-94

their injury. Second, Defendants were aware of their gross misrepresentations and intimately aware Fusion GPS was paid to provide non-legal falsities at the DNC and Perkins Coie's own request. When Glenn Simpson, Fusion GPS principal was questioned by the United States House of Representatives just weeks after Perkin Coie revealed its role (on October 24, 2017) serving as the hub of the activities creating and publishing the Dossier, he claimed *his* Fifth Amendment privilege *against self-incrimination*—not the attorney-client privilege or related confidentiality protection—to avoid testifying under oath about the actual compensated activities the DNC, through Perkins Coie *qua* paymaster, euphemistically labeled, "Legal Services." This was a necessary layer of concealment. *If* Simpson/Fusion GPS had actually been paid for legitimate "Legal Services" so-called, he could have provided sworn testimony about this topic because the October 24, 2017 Perkins Coie disclosure letter waived the DNC's putative attorney-client privilege.

As a result of the Defendants actions to conceal the facts at issue harming Dr. Page, Plaintiffs had neither knowledge nor an ability to uncover Defendants' web of deceit designed to conceal the 'money trail' which funded purchasing and publishing of the defamatory materials targeting Dr. Page. Fourth, Plaintiffs reasonably relied on Defendants' misinformation whereby he had little reason to doubt a renowned global legal team's ability to honestly cooperate in FBI Investigations. Fifth, reliance was detrimental because Plaintiffs' ability to hold his tortfeasors accountable in court was delayed. Lastly, the Defendants forced Plaintiffs to litigate extraneous jurisdictional and limitations issues all because Defendants' concealed their role in committing tortious injuries constitutes prejudice to Plaintiffs. Defendants' concealment of material facts previously denied Plaintiffs the opportunity to adequately plead their case in court. *Rainey v. City of Chi.,* 10 C 07506, 2013 WL 941968 (N.D. Ill. Mar. 11, 2013). Therefore, Defendants are equitably estopped from raising the statute of limitations defense. Alternatively, as the Defendants admit, the statute of limitations is an affirmative defense.

Unquestionably it is for the trier of fact to determine if the facts as alleged by Plaintiffs establish the elements of equitable estoppel sufficiently preventing a limitations defense.

## IV.     THIS COURT HAS SPECIFIC JURISDICTION OVER ALL DEFENDANTS

Specific jurisdiction exists "when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). "The contacts supporting specific jurisdiction can take many different forms" including employing an agent to conduct business activities or entering a business relationship in the forum state. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010). The "minimum contact" inquiry "focuses on 'the relationship among Defendants, the forum, and the litigation.'" *Keeton v. Hustler Magazine, Inc.*, 456 U.S. 770, 775 (1984).

Perkins Coie, Elias, and Sussman, allegedly under an attorney-client relationship, acted as agents of the DNC. Perkins Coie, acting through at least two of its partners, Elias and Sussman, represented the DNC and the Clinton Campaign. As tasked by the DNC, the agents sought the services of Fusion GPS.[15] In fact, the DNC funded Perkins Coie's engagement of Fusion GPS and Steele, and all together conspired against Dr. Page for its own political goals.[16] Therefore, the contacts and activities directed towards the forum state by the agents, including the retention of Fusion GPS, constitute contact by all Defendants. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008). Furthermore, for this reason, the Court can find personal jurisdiction over all Defendants who are co-conspirators. Plaintiffs allege that Defendants' conspiracy had significant involvements in Illinois.

---

[15] By late July 2016, Steele met with an attorney from Perkins Coie, which was acting in its capacity as representative of the DNC. OIG Report, *supra* note 6, at 96, n.221. During Steele's September 2016 trip to Washington D.C., he "met with an attorney from Perkins Coie, who was general counsel to the Clinton campaign." *Id.* at 96. "Steele was aware that "Democratic Party associates were paying for Fusion GPS' research [and that] the 'ultimate client' was the leadership of the Clinton presidential campaign." *Id.*

[16] Hosenball, *supra* note 1.

Therefore, under Illinois law, the Court can assert personal jurisdiction over all Defendants based on any single Defendant's "involvement in a conspiracy which occur[s] within the forum." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 43 F.Supp.2d 906, 912 (N.D. Ill. 1999); *See Markarian v. Garoogian*, 767 F. Supp. 173, 178 (N.D. Ill. 1991) ("A defendant can be subject to the jurisdiction of an Illinois court under the conspiracy theory if: 1) the defendant was part of an actionable conspiracy; and 2) a co-conspirator performed a substantial act in furtherance of the conspiracy in Illinois.")

There is irrefutable evidence of an existing business relationship and communication between Defendants in Chicago. The letter written and signed by Matthew Gehringer, Perkins Coie's firm-wide General Counsel located in Chicago, revealed that in April 2016, Perkins Coie engaged Fusion GPS. The letter states that Fusion GPS was hired to conduct "opposition research" on behalf of the DNC and the Clinton campaign. This relationship strongly implicates directed activity in Chicago. By virtue of his position as Perkins Coie's General Counsel, Gehringer is "responsible for all legal matters" of the firm. Evidenced by the letter, this included oversight over retaining Fusion GPS for the "opposition research" and compilation of the statements at hand. Gehringer's letter serves as clear evidence that there was purposefully directed activity in the forum state in Perkins Coie's Chicago office. Elias testified that, out of 31 members of his political law group that work for and report to him, only a couple are in Phoenix and the rest are in Chicago and Washington D.C. At minimum, a sizable portion of the conduct alleged in the Complaint arises from Defendants' undeniable ties to the Chicago office.

Furthermore, during the period leading up to the 2016 presidential campaign, the DNC employed Perkins Coie, Elias, and Sussman, and illusorily funded Fusion GPS through them. To describe DNC's involvement in Chicago as anything less than a purposefully directed activity at the forum state is simply unrealistic. These actions, which clearly have significant nexus to Chicago, arose from Defendants' political goals and severely damaged Dr. Page. By design, publicly available facts about

16

Defendants engagement in Chicago are limited. However, there is sufficient evidence to prove that, more likely than not, the orchestration of essential conduct alleged in the Complaint took place in Illinois – including the conduct related to fraudulent concealment of the tortfeasors discussed in Part Two Section III. *Linkepic Inc v. Vyasil, LLC*, 146 F. Supp. 3d 943, 951 (N.D. Ill. 2015) (employing the more-likely-than not standard for personal jurisdiction and stating that it will ultimately be up to the jury to decide on factual disputes).

Defendants' directed activities in Chicago also involved the Obama campaign, headquartered in Chicago, necessitating this Court's jurisdiction. According to FEC records, Obama For America ("OFA"), headquartered in Chicago, has paid over $972,000 to Perkins Coie between April 2016 to August 2017, again classified only as "Legal Services." This was the exact time that Fusion GPS was retained by Perkins Coie and funneling false information about Dr. Page to the Obama Administration. Such underhanded dealing strongly implicates directed action in relation to the Dossier in Illinois, where the Obama campaign was headquartered. Under *Arena Football League Inc.*, their role as attorneys and agents of the DNC, which undoubtedly held a large portion of their political operations in Chicago, should subject Elias and Sussman *as well as* Perkins Coie to personal jurisdiction in Illinois. *See Arena Football League Inc.,* 947 F. Supp. at 340-41 (holding that Illinois had personal jurisdiction over a foreign state licensed lawyer and his New York law firm, because they, as general counsel for the client in Illinois, engaged in sufficient business communications with the client in the forum state). The documents related to the Obama administration, including its intelligence collection activities and involvement in the attack against Donald Trump and Dr. Page, have been transferred to the Barack Obama Presidential Library in Chicago, where they remain hidden from public review today. *See* OIG REPORT at 77, 177-180.

Defendants' reliance on *Rios v. Bayer Corp.* is unfounded as the facts of *Rios* are significantly

distinguishable from the case at bar. Nos. 125020, 12502, 2020 WL 2963318 (Ill. Sup. Ct. June 4, 2020). There was no sale to or usage of a product by Dr. Page. Rather, the harm suffered by Dr. Page arose from the business relationship founded on engagement in opposition research and releasing public statements against their political opponents. Unlike in *Rios*, Plaintiffs here have sufficiently demonstrated that a business relationship existed between Defendants and Fusion GPS, which arose out of a larger relationship with Perkins Coie's General Counsel in Chicago. *Id.* at *6.

Plaintiffs clearly suffered injuries directly arising out of Defendants' relationship, so-called "Legal Services," and related activity in Illinois. As explained before, there is substantial evidence to indicate that the Chicago office served as a central hub for DNC's political campaign activities and was involved in concealing DNC's engagement with Fusion GPS through Perkins Coie. In compiling the defamatory statements, distributing them to both the public and the U.S. Intelligence Community, and concealing DNC's involvement, Defendants' very purpose and *raison d'etre* for their relationship were to harm the image of Dr. Page for their own collective political advantage. *See Linkepic,* 146 F. Supp. at 953 (holding that, when the allegedly tortious conduct in the forum state had the purpose of the alleged tort itself, the claim sufficiently satisfies the 'arising out' requirement). Therefore, Plaintiffs can sufficiently establish prima facie personal jurisdiction.

## V. IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY

For the reasons stated above, Plaintiffs contend that personal jurisdiction has been well established. Should the Court find otherwise, the Court still has the discretion to grant this motion for jurisdictional discovery. *Sanderson v. Spectrum Labs, Inc.,* 248 F.3d 1159 (7th Cir. 2000). Because Plaintiffs' allegations establish a "colorable," if not prima facie, showing of personal jurisdiction, the Court should allow Plaintiffs to "uncover facts that might establish jurisdiction." *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 136 F. Supp. 3d 968, 973

(N.D. Ill. 2015). Even when the general allegations are "insufficient to establish jurisdiction," a court may allow jurisdictional discovery when the allegations establish a "colorable showing" that "at a minimum, plaintiffs have shown that factual record on the jurisdiction 'is at least ambiguous or unclear'." *Id.* at 976; *see Gilman Opco LLC v. Lanman Oil Co.*, No. 13-CV-7846, 2014 WL 1284499, at *6 (N.D. Ill. Mar. 28, 2014) ("Courts generally will grant jurisdictional discovery if Plaintiffs can show that the factual record is at least ambiguous or unclear on the jurisdiction issue.") (internal quotations omitted)

Plaintiffs allegations more than sufficiently establish a colorable showing of personal jurisdiction. *Indag GmbH & Co. v. IMA S. P.A.*, 150 F. Supp. 3d 946, 972 (N.D. Ill. 2015) (holding that plaintiffs are entitled to jurisdictional discovery because they "demonstrated at least a single contact" and "alleged the possibility of additional . . . contacts that, if substantiated, may support the Court's exercise of personal jurisdiction . . . .") The letter from the Chicago office and the existence of Perkins Coie attorneys reporting to Elias from Chicago clearly demonstrate the likelihood of additional contacts in Illinois by Defendants. [17] *See Calloway v. AT&T Corp.*, No. 18-C-06975, 2019 WL 4694724, at *2 (N.D Ill. Sept. 26, 2019) ("In other words, a plaintiff seeking jurisdictional discovery must advance 'proof to a reasonable probability' of the facts necessary to establish federal jurisdiction"). Despite Defendants' cowardly attempts at hiding the information, Plaintiffs have raised a "sufficient question" on Defendants' directed activity in Chicago. *Id.* at *5. Therefore, should the Court not find personal jurisdiction, the Court should grant Plaintiffs' motion for jurisdictional discovery taking all facts and disputes in the light most favorable to Plaintiffs. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 876-78 (7th Cir. 2006).

---

[17] This includes facts related to the direct nexus between Defendants and the Obama Administration, which used the defamatory statements in support of false FISC court pleadings.

## VI.    THE VENUE IS PROPER FOR THIS CASE

The venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial share of the events giving rise to the claims occurred within the Northern District of Illinois. Under this subsection, a plaintiff does not need to demonstrate that a majority of the events took place in the district, but rather that the events which took place within the district were "substantial." *Pasulka v. Sykes*, 131 F. Supp. 2d 988, 994 (N.D. Ill. 2001). To qualify as "substantial," it is sufficient to show that the events that took place in the district were part of the historical predicate for the claims alleged in the complaint. *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 867 (N.D. Ill. 2009).

Here, Dr. Page's claims stem from the actions of Fusion GPS on behalf of and in concert with Defendants. As noted previously, Defendants' relationship with Fusion GPS directly involved Perkins Coie's Chicago office. It is this correspondence between Perkins Coie's General Counsel and attorneys for Fusion GPS, as well as the direct nexus with the Obama Administration which led the DNC's move to Illinois, that reflects the historical predicate for the instant suit; therefore, Plaintiffs' assertion that a "substantial" part of the events giving rise to the claims took place in this district is accurate. *See Pasulka*, 131 F. Supp. 2d at 994 ("[V]enue under [§] 1391(a)(2) may be satisfied by a communication to or [from] the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action"). Even if this Court were to find that a substantial part of the events giving rise to the claim did not occur in this district, this venue is appropriate under §1391(b)(3) because Defendants are subject to specific personal jurisdiction in this district. Therefore, the Court should deny the Defendants' 12(b)(3) motion.

## VII. PLAINTIFFS HAVE MADE PLAUSIBLE AND MERITORIOUS ALLEGATIONS OF THEIR SUBSTANTIVE CLAIMS

### A. PLAINTIFFS' DEFAMATION CLAIM IS PLAUSIBLE

In a defamation complaint, a plaintiff must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. S*wierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). The complaint need not report the alleged defamatory statement verbatim, but "the substance of the statement must be pleaded with sufficient precision and particularity so as to permit initial judgment review of its defamatory content." *Green v. Rogers*, 234 Ill. 2d 478, 492 (2009). Plaintiffs' Complaint has set forth the defamatory statements sufficiently to meet Illinois' pleading standard.

Under Illinois law, the **elements** of defamation are: (1) the defendant made a false statement concerning Plaintiffs; (2) there was an unprivileged publication of the defamatory statement to a third party by the defendant; and (3) the publication damaged the plaintiff. *Green*, 234 Ill. 2d 478, at 491.[18] When the words used are so obviously and materially harmful to the plaintiff that injury or reputation may be presumed, the statement is considered defamatory *per se*. *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill. 2d, 77, 87 (1996). Under Illinois law, there are five categories of defamation *per se*: (1) statements that impute commission of a criminal offense; (2) statements imputing infliction of loathsome communicable disease; (3) statements that impute an inability to perform or of integrity in discharge of duties of office or employment; (4) statements that prejudice a party or impute lack of ability in his or her trade, profession or business; (5) statements imputing fornication and adultery. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501 (2006).

In the present case, the accusations made against Plaintiffs fall under the first, third, and fourth form of defamation *per se*. The average person who read or heard the defamatory statements from the

---

[18] A statement is considered defamatory if it tends to cause such harm to the reputation of another, that it lowers that person in the eyes of the community or deters third persons from associating with her or him. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 221 Ill. 2d. 558, 579 (2006).

Dossier, understood them to mean that Dr. Page was conspiring with Russia on matters against United States interests. (Compl. ¶ 75). This is evidenced by the resulting FISA applications against Dr. Page and the reaction on a national scale including the American public and the U.S. government. As a result, Dr. Page's reputation was grievously harmed; he has been branded as a "traitor," has received numerous death threats, and his personal, professional, and business reputations have been devastated by these false accusations. (*Id.* ¶ 148).

Illinois courts recognize that when the defamatory statement does not name the plaintiff, the defamation claim is actionable so long as persons other than the plaintiff and the defendant reasonably understood the libelous expression was about the plaintiff. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 925 (7th Cir. 2003); *Bryson*, 174 Ill. 2d at 98-99; (finding that the determination as to whether an article was actually understood by third parties to be about the plaintiff, where the plaintiff was not explicitly named, is a question of fact for the jury). Both Global Energy and Global Natural Gas have been economically battered by the false accusations defaming Dr. Page. As founder and sole owner, Dr. Page is the face of these companies and he cannot be distinguished from them. A reasonable individual who read or heard the false accusations about Dr. Page would instantly impute those negative connotations to both Global Energy and Global Natural Gas. As such, the two entities are properly named as Plaintiffs in the Complaint.

### i. THE STATEMENTS ARE *NOT* "SUBSTANTIALLY TRUE"

In order to raise truth as a defense, a defendant must establish substantial truth. A court may only dismiss a claim if the defendant makes a showing of the truth of the "gist" or "sting" (meaning "the heart of the matter in question – the hurtful utterance") of the alleged defamatory imputation. *Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987). When determining the "gist" or "sting" of the allegedly defamatory material, a court must "look to the highlight of the article, the pertinent

angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Id.* Whether a defendant has made a showing of substantial truth is a fact question for a jury to determine. Consequently, it is impossible to rule *as a matter of law* the standards of "substantially true" legally protect the Defendants' defamatory statements.

Here, not only do Defendants fail to show that the false statements are substantially true, an investigation by the Department of Justice has determined that the statements were entirely unsupported accusations.[19] Defendants refuse to acknowledge that their malicious statements extend far beyond false allegations of the fictitious meetings,[20] all of which have been proven to lack even a scintilla of truth.[21] Defendants' defamatory statements included allegations that Dr. Page "met with Igor Sechin, a longtime Putin associate and former Russian deputy prime minister who is now the executive chairman of Rosneft" and that Dr. Page "met with another top Putin aide while in Moscow — Igor Diveykin." Compl. ¶ 62. The "gist" is not simply that Dr. Page coordinated with Russian contacts, but rather that Dr. Page had a clandestine meeting with Sechin and Diveykin in Moscow. The statements accused Dr. Page of acting as an intermediary for Russia, coordinating with the Russian government for the 2016 U.S. Presidential Election, and cooperating to lift sanctions against Russia. These life-shattering statements are the worst forms of political malpractice and have been exposed as total lies. Dr. Page's personal and economic life continues to be substantially injured. Plaintiffs have more than sufficiently raised their right for relief; this Court should apply the general rule and deny Defendants' Motion.

---

[19] *See* OIG REPORT, *supra* note 8.

[20] Defendants' Dossier report was replete with falsehoods describing Dr. Page as an intermediary between Russia and the Trump campaign in a "well-developed conspiracy of cooperation between Russian leadership." *Id.* at 130. The false report also falsely asserts that Dr. Page was in discussion with Igor Sechin in regard to "bilateral energy cooperation and prospects for an associated move to lift Ukraine-related western sanctions against Russia" and that Dr. Page "conceived and promoted" the leaking of DNC emails to Wikileaks by Russia. *Id.* at 98, 130.

[21] *Id.* at xi.

### ii. THE STATEMENTS ARE *NOT* REASONABLY CAPABLE OF INNOCENT CONSTRUCTION

The innocent-construction rule must be considered "in context, with the words and the implications therefrom given their natural and obvious meaning." *Chapski v. Copley Press*, 92 Ill. 2d 344, 352 (1982); *see also Bryson,* 174 Ill. 2d at 90 ("Whether a statement is reasonably susceptible to an innocent interpretation is a question of law . . . .") A plaintiff's allegations "read in the light most favorable to him, entitle him to the chance to prove his claim under a defamation *per se* theory." *Muzikowski*, 322 F.3d at 927.

To begin, the statements are not reasonably capable of innocent construction and it is unreasonable to argue otherwise. The statements made were entirely false as Dr. Page has never met with Sechin or Diveykin, secretly or publicly, and did absolutely nothing alleged in the Dossier reports. *See* Compl. ¶ 70. But more than that, these lies were specifically engineered to tarnish Dr. Page and the Trump campaign's reputation simply to advance Defendants' political goals. The accusations in the Dossier were undeniably destructive and performed their intended goal of destroying Dr. Page's image. There is no part of the Dossier, such as the accusation that Dr. Page coordinated with the Russian government for the 2016 Presidential Election, that could reasonably be interpreted as anything less than painting Dr. Page as an agent of a foreign power. Until the defamatory statements were published, he had never received death threats. That the statements cannot be seen as being of innocent construction is clearly evidenced by the national recoil and the consequent undeserved harm to Dr. Page; the FBI relied heavily on these very statements to obtain faulty FISA warrants against Dr. Page. Defendants would have had no incentive to publicly release such statements *if* the statements could be reasonably seen as innocently constructed. They relied on the statements being taken as serious accusations — that Dr. Page was working for a foreign power — in order to falsely paint Dr. Page (and the Trump campaign) as being under Russian influence. The clear purpose is to imply illicit

ties between Dr. Page and the Russian agents, thus drawing his character and patriotism into question and, in so doing, causing legal injuries to Dr. Page's personal and business reputations. Therefore, no innocent construction is applicable to Defendants' statements. If Defendants want to make such nonsensical arguments to a jury, they may.

### iii. DEFENDANTS ACTED WITH ACTUAL MALICE

Dr. Page was not a public figure prior to the release of the defamatory statements; it was Defendants own tortious conduct that involuntarily injected him into a public controversy.[22] Regardless, the facts undoubtedly prove that Defendants acted actual malice. A complaint alleging that defamatory statements were made with knowledge of their falsity or with reckless disregard as to their truth or falsity is sufficient to withstand a motion to dismiss. *Krueger v. Lewis*, 342 Ill. App. 3d 467, 472-73 (2003) (finding that actual malice was sufficiently alleged where the complaint stated that the statements were made by the defendant "in full knowledge that they were untrue or in reckless disregard of their truth or falsity") (internal quotation marks omitted); *Colson v. Stieg*, 89 Ill. 2d 205, 215-216 (1982) (finding that the allegations of actual malice were sufficient to withstand a motion to dismiss where the complaint alleged that the defendant made the allegedly defamatory statement "maliciously, willfully and intentionally" and "knowing it to be false.")

Plaintiffs met the pleading standard of actual malice. The Complaint specifically avers that Defendants knew the defamatory statements were false or acted in reckless disregard of the truth.

---

[22] Prior to the release of the defamatory statements, Dr. Page did not have "such a degree of general fame and notoriety in the community" to be considered "public figure for all purposes. . ." nor had he "voluntarily injected. . .[himself] into a public controversy. . . ." *Rosner v. Field Enter., Inc.,* 205 Ill. App. 3d 769, 783 (1990) (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 354 (1974)). Rather, Dr. Page was *involuntarily* injected into the controversy engineered by Defendants themselves. Prior to the release of their malicious lies, Dr. Page was recognized only within narrow circles of academic foreign policy and energy circles and did not even have a Wikipedia page. *See Hutchinson v. Proximire,* 443 U.S. 111, 112-13 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.") Plaintiffs do not concede this issue and reserve the right to fully contest this at trial.

Compl. ¶¶ 113, 122, & 131. Additionally, Plaintiffs' Complaint asserts that Defendants retained Fusion GPS on their behalf to produce negative information on then-candidate Trump in order to tarnish the Trump campaign and its affiliates. *Id.* ¶¶ 4-38. The Complaint further states that Defendants knew that GPS was a "purveyor of misinformation," they knew that the information GPS produced was faulty, and they knew the effect it would have on Plaintiffs. *Id.* ¶¶ 89-100. *See Intercon Sol., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1057 (N.D. Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015) (holding that actual malice requirement was satisfied with allegations that defendant conducted an "illicit investigation" that resulted in the allegedly defamatory statements, that the defendant should have known its investigation was flawed and that the accusations were false, and that the defendant's actions were motivated by self-interest). Therefore, the Court should deny Defendants' Motion.

### B.    PLAINTIFFS' FALSE LIGHT CLAIM IN PLAUSIBLE

Publicity to a matter concerning another that places them in a false light is an invasion of privacy. In Illinois, a plaintiff must show: (1) that the defendant placed him in a false light before the public, (2) that false light in which he was placed would be highly offensive to a reasonable person, and (3) the defendant acted with actual malice. *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 18 (1992) ("The purpose underlying the false light cause of action is to define and protect [the] area within which every person must be left alone.") Because Plaintiffs have properly pleaded all elements, Defendants' Motion should be denied. This is a fact question for the jury.

Plaintiffs pleaded that the statements about Dr. Page from the Dossier were false. Investigations proved that Dr. Page never had illicit "secret meetings" with Russian officials as the report alleges. Compl. ¶¶ 7-62. In fact, the investigation found that not a single source corroborated any of the accusations made against Dr. Page. The offensiveness element is met "when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously

offended." *Kolegas*, 154 Ill. 2d at 19 (quoting Restatement (Second) of Torts, § 652E (1977)); *Dubinsky v. United Airlines Master Exec. Council*, 303 Ill. App. 3d 317, 331 (1999) (finding that attributing unethical and illegal activity to a plaintiff is sufficiently offensive for a false light claim). Defendants' statements had the effect of painting Dr. Page, a distinguished military veteran, as a traitor to the United States. Compl. ¶ 5. A reasonable person would find being labeled a traitor to their country highly offensive, let alone Dr. Page, who has served his country honorably in the U.S. Navy and U.S. Intelligence Community. *Id.* ¶ 6. For this reason, Plaintiffs specifically pleaded that Defendants "acted with actual malice in disseminating the Defamatory Statements—Defendants disseminated statements with knowledge that they were false or with reckless disregard of whether they were false or not." *Id*. ¶ 79. At this stage of pleading, this is all that is required. *See e.g., Bogosian v. Bd. of Educ. of Cmty. Unit Sch. Dist*. 200, 73 F. Supp. 2d 949, 953, (N.D. Ill 1999). Therefore, Defendants' Motion should be denied.

### C.   PLAINTIFFS' TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIM IS PLAUSIBLE

To state a claim for tortious interference with prospective economic advantage, Plaintiffs must plead: "(1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). For the reasons below, Plaintiffs' allegations satisfy each requirement. *See* Compl. ¶¶ 139-144.

### i.   VALID BUSINESS EXPECTANCIES EXISTED

A plaintiff need not "allege the specific third party or class of third parties with whom [the plaintiff] claims to have had a valid business expectancy." *Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998) (holding that a plaintiff who alleges the basic elements of the claim "might be able to prove

27

a set of facts (including the identity of the parties or class of parties) that would entitle him to relief"). In this case, Plaintiffs alleged the necessary elements of tortious interference with business relations and sufficiently stated the claim. *Id.* ("A Rule 12(b)(6) motion cannot be used to dismiss a complaint on the ground that it does not include information that Rule 8 does not require it to contain.").

With respect to element one, Plaintiffs clearly allege they had business expectancies in their relationship with an identifiable class of third parties—the 15 energy companies and financial firms that are consumers of services provided by Plaintiffs. Compl. ¶ 139. Defendants' own moving papers concede the existence of two business expectancies between Plaintiffs and financial firm Samruk-Kazyna, and an oil trading venture involving the Dubai Mercantile Exchange. *Id.* ¶ 98. Plaintiffs further contend that Defendants' actions have completely barred Dr. Page from engaging in future energy financing transactions. *Id.* ¶¶ 141-44. Indeed, much of the complaint pertains to the consumers who, but for the proximate and direct unlawful acts of Defendants, would have transacted with Plaintiffs. Thus, Plaintiffs have adequately pleaded the existence of business expectancies and Defendants' tortious interference to cripple them. *Quadro Enters., Inc. v. Avery Dennison Corp.*, No. 97-C-5402, 1999 WL 759488, at 7 (N.D. Ill. Sept. 8, 1999) ("allegation of a reasonable expectation of continued business is sufficient, under a notice pleading standard, to survive a motion to dismiss").

## ii. THE INTERFERENCE WAS INTENTIONAL AND UNJUSTIFIABLE

Plaintiffs also satisfy the second and third element of their tortious interference claim. It ill behooves Defendants' credibility to argue "Plaintiffs have not alleged facts sufficient" to establish a claim for tortious interference with prospective economic advantage. Plaintiffs allege the relevant facts necessary to support their tortious interference claim. First, Plaintiffs allege that Defendants searched "Plaintiffs [*sic*] business records," and deliberately continued a research campaign, in opposition to then-candidate Donald Trump. Thus, Defendants had knowledge of facts or information that, upon

further reasonable inquiry, would have led Defendants to discover the existence of a relationship or expectancy. *Tom Olesker's Exciting World of Fashion v. Dun & Bradstreet, Inc.*, 16 Ill. App. 3d 709, 711 (1973), *judgment rev'd in part & aff'd in part*, 61 Ill. 2d 129 (1975) (finding that the plaintiff sufficiently alleged that the defendant intentionally sought to prevent the plaintiff from entering into credit agreements with potential creditors by publishing a negative credit report, although there was no indication that the defendant knew the nature of the proposed dealings between the plaintiff and its potential customers when it published its report). This sufficiently satisfies element two. *See Malatesta v. Leichter*, 186 Ill. App. 3d 602, 619 (1989).

Additionally, the intentional interference includes Defendants' conduct pleaded in Plaintiffs' claims of conspiracy, defamation, and false light. Plaintiffs sufficiently allege, as the OIG Report found, Defendants paid consultants to provide unverified misinformation—even blatant lies. Defendants strategically distributed the misinformation to executives of popular news and media information providers, and to FBI officials, with the intent to destroy the supporters of Donald Trump's 2016 Presidential Campaign. Throughout their course of action, Defendants targeted Dr. Page as the primary accused party and purposefully characterized him as an agent of treason. As a result, Defendants deprived Plaintiffs of any public confidence and unjustifiably interfered with the valid business relationships and Plaintiffs' expectancy of fulfilling them. Under the correct standards, this is more than enough to satisfy the third element of the tortious interference claim. Because Plaintiffs clearly satisfy the liberal requirements of notice pleading, Defendants' Motion should be denied.

### D.     PLAINTIFFS' CONSPIRACY CLAIM IS PLAUSIBLE

The facts alleged in Plaintiffs' Complaint sufficiently demonstrate the plausible existence of an agreement between Defendants to commit the unlawful and tortious acts outlined above. "In order to state a claim for civil conspiracy, a plaintiff must allege facts establishing both (1) an agreement to

accomplish such a goal and (2) a tortious act committed in furtherance of that agreement." *Reuter v. Mastercard Int'l, Inc.*, 397 Ill. App. 3d 915, 927 (2010). Plaintiffs have sufficiently plead the "who, what, when, where, and how" of the conspiracy with sufficient detail to survive a motion to dismiss. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

Plaintiffs contend that an agreement was formed directly preceding the 2016 Presidential Election, specifically in April 2016, when Perkins Coie engaged Fusion GPS to do research on behalf of, and to be paid for by, its client, the DNC. Compl. ¶ 39.[23] This confirms when the agreement was formed. The Complaint also points to the existence of an agreement between the DNC and Fusion GPS, through intermediary Perkins Coie as directed in the letter. *Id.* ¶ 22. This agreement, on information and belief, was the agreement made with the purpose of defaming Dr. Page (and the Trump campaign) and unjustly gaining political advantage. This alleges where the agreement was formed. Plaintiffs also state in the Complaint that this agreement was formed by communications between the DNC and Fusion GPS that was facilitated by longtime Democratic political allies and Perkins Coie lawyers, Elias and Sussman. *Id.* ¶¶ 20, 37. This asserts how the agreement was formed as well as who formed the agreement. The facts alleged are sufficient to survive Defendants' Motion.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully urge that Defendants' Motion to Dismiss be denied.

---

[23] *See* OIG REPORT, *supra* note 6, at 93-94.

Dated:  July 1, 2020

/s/ Brian J. Murray
Brian J. Murray (IL 6272767)
**RATHJE WOODWARD LLC**
300 E. Roosevelt Rd., Ste. 300
Wheaton, IL 60187
Tel: 630-668-8500
Fax: 630-668-9218
Email:  BMurray@rathjewoodward.com

John M. Pierce*
Andrew E. Calderón (*PHV* forthcoming)
PIERCE BAINBRIDGE P.C.
355 S. Grand Ave., 44th Floor
Los Angeles, CA 90071
Tel: (213) 262-9333
Email:  jpierce@piercebainbridge.com
        acalderon@piercebainbridge.com

* Lead Counsel

*Counsel for Plaintiffs Carter Page, Global Energy
Capital LLC, and Global Natural Gas Ventures LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: July 1, 2020                    /s/ Brian J. Murray
                                       Brian J. Murray